**POTOMAC ELECTRIC POWER COMPANY, Petitioner,**

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent,**

**People's Counsel of the District of Columbia and Washington Metropolitan Area Transit Authority, Intervenors.**

**Nos. 79–1159, 79–1106.**

District of Columbia Court of Appeals.

Argued Oct. 9, 1981.

Decided Feb. 16, 1983.

779

William Dana Shapiro, Gen. Counsel, Washington, D.C., with whom Edward A. Caine, William C. Gardner and Betty K. Cauley, Washington, D.C., were on the briefs, for petitioner.

Lloyd N. Moore, Gen. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel at time brief was filed, and Melvin J. Washington, Asst. Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Elizabeth A. Noel, Asst. People's Counsel, Washington, D.C., with whom Brian Lederer, People's Counsel, Washington, D.C., was on the brief, for intervenor People's Counsel.

Onkar N. Sharma, Asst. Gen. Counsel, Washington, D.C. was on the brief for intervenor Washington Metropolitan Area Transit Authority.

Before NEWMAN, Chief Judge, and KELLY and NEBEKER, Associate Judges.

NEWMAN, Chief Judge:

The Public Service Commission of the District of Columbia (Commission) denied two applications submitted by the Potomac Electric Power Company (PEPCO)

for emergency rate relief.[1] In this consolidated appeal, PEPCO raises numerous objections to these decisions. It contends that the Commission's refusal to order an emergency increase in electric rates was arbitrary and constituted an unconstitutional confiscation of property. Additionally, PEPCO claims that it was improper for the Commission to evaluate its applications in light of the Company's overall financial situation, rather than only earnings on its District of Columbia operations. Finally, PEPCO complains that it was denied procedural due process by the Commission's dismissal of its second emergency rate relief application without a hearing. PEPCO asks this court to order the Commission to authorize a temporary rate surcharge enabling it to collect the revenues it would have gained had the Commission granted the requested emergency rate relief. We find PEPCO's arguments unpersuasive and affirm the Commission's orders.

## I. Background and Procedural History

This case involves retail electric rates in the District of Columbia between June 1979 and May 1980. In June 1979, PEPCO filed an initial application for an emergency increase in its charges for electric service within the District of Columbia. PEPCO proposed to collect this increase subject to refund pending final decision on its related application for a permanent rate increase. In May 1980, the Commission granted PEPCO a permanent rate increase pursuant to the related application, thereby alleviating

PEPCO's alleged emergency. PEPCO now seeks to recapture the revenue to which it argues it was entitled for the period from August 17, 1979, when the Commission denied PEPCO's initial request for emergency rate relief, to May 31, 1980, when the permanent rate increase went into effect.[2]

A summary of PEPCO's recent rate history is essential for a complete understanding of the issues. In November 1975, the Commission granted PEPCO a permanent increase in retail rates of $27,657,000. Immediately thereafter in December 1975, PEPCO filed another application which, as amended, requested a permanent rate increase of $57,578,000. In December 1976, as a result of this application, PEPCO received a $29,411,000 permanent rate increase.

In July 1977, PEPCO filed another application for a permanent increase which was considered by the Commission in Formal Case 685. As amended, this application sought to increase the Company's annual gross operating revenues by approximately $44.9 million. This request was based on 1977 test year data. While this case was still pending, PEPCO filed another permanent rate increase application. This application, considered in Formal Case 715, initially sought an annual increase in retail rates of $15,464,000.

On June 14, 1979, the Commission issued a proposed order in Formal Case 685 (Order No. 6096). It recommended that PEPCO be allowed to receive a 9.03% rate of return[3]

---

1. PEPCO's applications for relief were styled as applications for "immediate emergency rate relief." Subsequently, the applications have been referred to by the parties as applications for "temporary rate relief," "interim rate relief," or "emergency rate relief." Under District of Columbia law, the terms are interchangeable. They all refer to a request for the expedited imposition of a rate increase that is subject to refund depending on the disposition of a related application for a permanent rate increase. This court has upheld the Commission's power to issue such a rate increase as a power implied from the Commission's specifically granted statutory powers. *Chesapeake & Potomac Telephone Co. v. Public Serv. Comm'n,* D.C.App., 330 A.2d 236, 240 (1974).

2. PEPCO does not seek to recapture any revenue for the period covered by its first application for emergency rate relief, *i.e.,* from June 21, 1979 to August 17, 1979.

3. The Company's authorized overall rate of return is determined by the "cost of capital" method. That method seeks to determine what return the Company must offer its investors in order to attract the capital investment in its stocks and bonds necessary to finance its construction and operations. *See Re Potomac Elec. Power Co.,* 29 PUR4th 517, 521 (D.C.P.S. C.1979). *See also Sun City Water Co. v. Arizona Corp. Comm'n,* 26 Ariz.App. 304, 309–10, 547 P.2d 1104, 1109–10, *vacated on other grounds,* 113 Ariz. 464, 556 P.2d 1126 (1976)

through a permanent rate increase of approximately $5.8 million. A day later, the Commission allowed PEPCO to begin collecting this proposed revenue increase pending the issuance of a final order. The final order essentially adopted the proposals of Order 6096 by authorizing a permanent rate increase of $5,890,000.

The authorized increase in Formal Case 685 was significantly less than the requested rate increase of $44.9 million. Thus, in July 1979, PEPCO revised its application for new permanent rates in Formal Case 715 to request an increase in revenues of approximately $48.1 million over the revenue level authorized in Case 685. Additionally, before the final order in Case 685 was issued, PEPCO filed its initial application for emergency rate relief as part of Case 715. This application, as amended, sought an immediate $22,945,000 rate increase

pending the disposition of its application for new permanent rates.

Therefore, in July 1979, shortly after the completion of Formal Case 685, PEPCO had two outstanding applications for rate relief. A primary application sought a permanent rate increase of $48,079,000 in annual revenue based on a test year ending June 1979. An emergency rate application sought the immediate authorization of $22,945,000 of that $48.1 million.

This application for emergency rate relief was the subject of a Commission hearing in July 1979, before any hearings were held in the connected permanent rate case.[4] The Commission took testimony from PEPCO officials and heard oral argument on motions to dismiss filed by intervenors Washington Metropolitan Area Transit Authority, the General Services Administration, the Office of People's Counsel, and the Commis-

(en banc); *City of Evansville v. Southern Ind. Gas & Elec. Co.,* 167 Ind.App. 472, 479–82, 339 N.E.2d 562, 569–70 (1975); *In re Southwestern Bell Tel. Co.,* 10 PUR4th 323, 328–29 (Ark.P.S.C.1975); *In re Southern Conn. Gas Co.,* 24 PUR4th 162, 194 (Conn. Pub. Utils. Control Auth. 1978).

> The rate of return is an expression, in terms of percentage of rate base, of: "... the amount of money a utility earns, over and above operating expenses, depreciation expense, and taxes, expressed as a percentage of the legally established net valuation of utility property, the rate base. Included in the 'return' are interest on ... debt, dividends on preferred stock, and earnings on common stock equity. In other words, the return is that money earned from operations which is available for distribution among the various classes of contributors of money capital...." [*Re Potomac Elec. Power Co.,* 29 PUR4th at 521–22 (quoting P. Garfield & W. Lovejoy, Public Utility Economics 116 (1974)).]
> The overall cost of a utility's capital is calculated by determining the cost of each component in the company's capital structure. A weighted cost for each component is derived by multiplying its cost by its ratio to total capital. The sum of these weighted costs then becomes the utility's overall rate of return, which is multiplied by the company's rate base to determine the company's revenue requirement. *See id.*

4. The Commission generally divides hearings on a company's permanent rate increase application into two phases. Phase I is devoted to

the determination of the overall revenue requirements of the company for its District operations. The Commission sets an "authorized" rate of return during Phase I, and determines whether existing rates are unjust and unreasonable. In Phase II, the Commission determines a rate structure that fairly allocates the proposed revenue increase among the various classes of consumers so as to provide the required revenue.

The Commission has usually granted emergency rate increases only after Phase I hearings were completed. *See, e.g., In re Washington Gas Light Co.,* PSC Order No. 5517 (June 26, 1972); *Re Pepco,* 82 PUR3d 209, 212 (D.C.P.S.C.1970); *In re Chesapeake & Potomac Tel. Co.,* PSC Order No. 5644 (May 10, 1974), *aff'd in Chesapeake and Potomac Tel. Co. v. Public Serv. Comm'n, supra.* In this manner, the Commission can ensure that the company has satisfied its burden of showing entitlement to higher rates. This practice also ensures that consumers are allowed a full and fair opportunity to test the company's case as to the reasonableness of the rates. In only one case has the Commission found conditions to be so damaging to the company that it granted emergency relief prior to the completion of Phase I hearings. *See In re Washington Gas Light Co.,* PSC Order 5655 (July 11, 1974).

The Commission held a formal hearing on PEPCO's emergency rate application prior to its Phase I hearings in Formal Case 715 in response to PEPCO's motion for expedited consideration of this emergency application.

sion staff. On August 17, 1979, the Commission issued Order and Opinion 7020 granting the motions to dismiss. The Commission found that PEPCO's allegations, even if taken as proven, failed to demonstrate the extraordinary circumstances necessary to establish a *prima facie* case for emergency relief. After their motion for expedited reconsideration was denied, PEPCO filed a second application for emergency relief on August 27, 1979. The Commission directed PEPCO to submit "a list of factual and legal grounds relied on in the second application that were not similarly advanced" in the first application. After PEPCO responded, the Commission dismissed the second application without a hearing. PEPCO appealed each dismissal separately. The appeals were consolidated by a prior order of this court.

Thus, after the Commission's dismissals of PEPCO's emergency relief applications, PEPCO continued to operate under the rate structure established in Formal Case 685 until a permanent $35.5 million rate increase was granted in Formal Case 715. (Opinion and Order 7135, May 15, 1980). In an unpublished order denying respondent's motion to dismiss, this court has decided that the permanent rate increase granted PEPCO in Formal Case 715 does not render the present appeals moot.

## II. SCOPE OF REVIEW

■ This court has jurisdiction to hear appeals from an order or decision of the Public Service Commission of the District of Columbia. D.C.Code 1981, § 43–905. Our scope of review is, however, "limited to questions of law, including constitutional questions, and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary or capricious." D.C.Code 1981, § 43–906. *See, e.g., Metropolitan Washington Board of Trade v. Public Service Commission,* D.C. App., 432 A.2d 343, 351 (1981); *Potomac Electric Power Co. v. Public Service Commission,* D.C.App., 402 A.2d 14, 17 (en banc),

*cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979); *People's Counsel v. Public Service Commission,* D.C.App., 399 A.2d 43, 45 (1979); *Washington Public Interest Organization v. Public Service Commission,* D.C.App., 393 A.2d 71, 75 (1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979).

■ Our scope of review of public utility commission orders is the narrowest judicial review in the field of administrative law. *Potomac Electric Power Co. v. Public Service Commission, supra* at 17. This is because Congress vested the sole ratemaking authority in the expertise of the Public Service Commission. The Commission, not this court, has the sole responsibility for balancing consumer and investor interests in designing rate structures and approving specific charges. D.C.Code 1981, §§ 43–501, –601, –611; *People's Counsel v. Public Service Commission, supra.* While we must ascertain that, in striking a balance between the competing consumer and investor interests, "the Commission has given reasoned consideration to each of the pertinent factors," *id.* at 45–46 (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968)), we must not substitute our judgment for that of the Commission. *Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 352; *accord Permian Basin Area Rate Cases, supra* 390 U.S. at 792, 88 S.Ct. at 1373; *Potomac Electric Power Co. v. Public Service Commission, supra* at 18. Even though we might arrive at a somewhat different decision than did the Commission, if there is substantial evidence to support the Commission's findings and conclusions and the Commission has given reasoned consideration to each of the pertinent factors, we must affirm. *Permian Basin Area Rate Cases, supra* at 792, 88 S.Ct. at 1373; *Potomac Electric Power Company v. Public Service Commission, supra* at 17; *Williams v. Washington Metropolitan Area Transit Commission,* 134 U.S. App.D.C. 342, 362, 415 F.2d 922, 942 (1968), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

■ Indeed, the Supreme Court has established that it is the "total effect" of a rate order, rather than the methodology employed, that determines the validity of the order.

> Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling.... It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. [*Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944) (citations omitted).]

This standard was held applicable to the District of Columbia Public Service Commission in *Washington Public Interest Organization v. Public Service Commission, supra* at 75:

> These statutory criteria [D.C.Code 1973, §§ 43–301, –401, –411, –705, –706] are akin to those governing the Federal Power Commission and its oversight by the federal courts. In that context, the Supreme Court has held that unless the overall effect of a rate is "unjust and unreasonable," the Commission's order should be approved, irrespective of "in-

firmities" in the methodology used to calculate it.

*Accord Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 351.

■ In order to ensure meaningful judicial review,[5] we have imposed an independent burden on the Commission to explain its actions fully and clearly, by (1) announcing the criteria governing its determination, and (2) explaining how the particular order reflects application of these criteria to the facts of the case. *Washington Public Interest Organization v. Public Service Commission, supra* at 76, 77. The additional requirements imposed on the Commission by *Washington Public Interest Organization v. Public Service Commission* do not detract, though, from the presumptive validity of Commission rate orders. The petitioner challenging an order carries the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken. *Federal Power Commission v. Hope Natural Gas Co., supra* 320 U.S. at 602, 64 S.Ct. at 287; *Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 352; *Potomac Electric Power Co. v. Public Service Commission, supra* at 18; *Goodman v. Public Service Commission,* D.C.App., 309 A.2d 97, 101 (1973). Even if the court disagrees with the Commission, if the Commission has fully and clearly ex-

---

**5.** In *Washington Public Interest Organization v. Public Service Commission, supra,* we clarified our role as a reviewing court in light of the broad authority allotted the Commission under *Federal Power Commission v. Hope Natural Gas Co.* and its progeny:

> While it is true that a regulatory commission cannot be faulted for its methodology if the "total effect of the rate order cannot be said to be unjust and unreasonable," *Federal Power Comm'n v. Hope Natural Gas Co.* [320 U.S. at 602, 64 S.Ct. at 287], it is also true that the methodology must be disclosed for the bearing it may have on that overall judgment. Absent precise explanation of methodology as applied to the facts of the case, there is no way for a court to tell whether the Commission, however expert, has been arbitrary or unreasonable. [*Washington Public Interest Organization v. Public Service Commission,* 393 A.2d at 76–77.]

This requirement is intended to assist the reviewing court:

> [B]ecause ratemaking is complicated and understandably prone to technical, often shorthand terminology, there is a substantial risk that agency action will be too conclusional—not elaborate enough—for a non-expert court confidently to review. A court, without insisting on more precise explanation, could simply be fooled into accepting arbitrary agency action by the mesmerizing influence of the confidently expressed language of experts.
>
> \*    \*    \*    \*    \*    \*
>
> While our own authority is ... limited, our authority—and responsibility—to find out why an agency acts as it does is considerable. [*Id.* at 78, 79.]

plained what it does and why it does it, and the agency decision is supported by substantial evidence, the court, upon a finding that the Commission order is reasonable in its overall effect, must sustain the order. *Washington Gas Light Co. v. Public Service Commission,* D.C.App., 450 A.2d 1187 (1982).

We are further mindful that we are reviewing a denial of a utility's request for emergency rate relief rather than the components of a permanent rate order. Important differences between the two proceedings dictate an even more limited role for this court when emergency relief is at issue. In the first place, we are reviewing an administrative inquiry whose purpose and consequences are much more limited than permanent ratemaking. Permanent ratemaking requires the Commission to set new rates, after detailed consideration of the appropriate test year, the property to be included in the rate base, and the fair and reasonable rate of return, that will be effective for an indeterminate future period. In deciding an emergency rate application, the Commission is merely deciding whether or not the utility's financial situation warrants granting a portion of a permanent rate

request in advance of actually establishing new permanent rates. Moreover, the Commission's power to grant emergency rate relief derives from an implied rather than express statutory power. This court has, therefore, advised the Commission that it should exercise its power to grant emergency relief with restraint. *Chesapeake and Potomac Telephone Co. v. Public Service Commission, supra* at 243. Having so advised the Commission, we should exercise equal restraint in overturning their expert judgment in denying this form of rate relief.

We approach petitioner's arguments with the foregoing principles in mind.

## III. THE COMMISSION'S APPLICATION OF ITS CRITERIA FOR GRANTING EMERGENCY RATE INCREASE

The Commission has consistently articulated three sets of circumstances which may serve as a basis for granting emergency rate relief. These circumstances, which comport with emergency ratemaking criteria in other jurisdictions,[6] may be summarized[7] as follows: (1) a present or clearly imminent threat that the Company

---

**6.** *See, e.g., Re Jersey Central Power & Light Co.,* 38 PUR4th 115, 117 (New Jersey Board of Public Utilities 1980); *Re Washington Water Power Co.,* 22 PUR4th 485, 488 (Idaho Public Utilities Commission 1977); *Re Upper Peninsula Power Co.,* 25 PUR4th 411, 414 (Michigan 1978); *Re Illinois Power & Light Co.,* Order # 58–907, June 14, 1974 (Illinois). For emergency ratemaking criteria in Ohio, *see* Bloomfield, *Emergency Rate Making for Ohio Public Utilities,* 37 OHIO ST. L.J. 108 (1976). For emergency ratemaking criteria in Missouri, *see State ex rel. Laclede Gas Co. v. P.S.C.,* 535 S.W.2d 561 (Mo.App.1976).

**7.** The three factors were set forth originally in Commission Order 5707, *Re Potomac Electric Power Co.,* 9 PUR4th 363, 365 (D.C.P.S.C. 1975), as follows:

The central issue then, is to identify those factors and circumstances which the company faces that are so critical that they justify the possible abridgement of the usual procedural rights of the parties and justify administrative action on what might be otherwise considered to be a less than adequate record.

A review of our previous decisions indicates such circumstances as: (1) a present or clearly imminent threat that the company

will be unable to continue meeting its public service obligation and, (2) a present or clearly imminent threat that the company will be unable to obtain necessary capital funds (to finance the construction of necessary new or replacement plant), see Re Potomac Electric Power Co. (DC 1970) 83 PUR3d 209; Re Washington Gas Light Co. (DC 1972) Order No. 5517; Re Washington Gas Light Co. (DC 1972) Order No. 5655. We would also add that earnings which produce a rate of return substantially less than that which is reasonable may warrant consideration of interim relief. However, the mere failure of a company to realize a previously authorized rate of return or a Phase I finding by the commission that the existing rate of return is less than reasonable is not sufficient in and of itself to warrant interim relief. See Re Potomac Electric Power Co. (DC 1972) 95 PUR3d 99. Neither is the allegation of potential difficulty in raising needed capital on the most favorable terms adequate, in and of itself, to justify relief, see Re Potomac Electric Power Co. (DC 1969) Order No. 5402.

will be unable to continue meeting its public service obligation; (2) a present or clearly imminent threat that the Company will be unable to obtain necessary capital funds to finance the construction of necessary new or replacement plant; (3) the Company is experiencing earnings which produce a rate of return substantially less than that which is reasonable.

PEPCO maintains that it satisfied these factors insofar as its initial application demonstrated that it was earning a rate of return substantially less than that which was reasonable. PEPCO's initial application alleged: (1) PEPCO's actual rate of return on its District of Columbia rate base for the twelve month period ending April 30, 1979 was 7.72%;[8] (2) the Commission had found in Formal Case 685 that, on the basis of a 1977 test year, a reasonable rate of return for PEPCO was 9.03%; (3) the deficiency constitutes a "financial emergency" entitling it to an immediate rate increase of $22.9 million, the amount necessary for it to earn a return of 9.03%.

The Commission correctly found that PEPCO failed to indicate any circumstances, other than the discrepancy between actual and authorized rates of return, which could prove an emergency need for rate relief. Nowhere in its first application did PEPCO present any other facts relating to a potential inability to raise necessary capital.[9] Nor did PEPCO present information in its initial application concerning a threat to its ability to meet its public service obligation. At the hearing held pursuant to PEPCO's initial application, the only testimony given by PEPCO officials that even mentions these two factors is based solely on PEPCO's alleged failure to earn its "authorized" rate of return.[10] In effect, PEPCO's first application alleged that simply because it was experiencing earnings which produced less than its previously "authorized" rate of return, it was also threatened with an inability to meet its public service obligation and to raise necessary capital.

While the Commission considered dismissing the initial application because PEPCO failed to direct its application to the first two factors, it proceeded to address and reject PEPCO's contention that it was entitled to relief because it met the third factor. In this regard, the Commission ruled that it was inappropriate to use the previously authorized rate of return as the presumptively reasonable rate of return for purposes of comparison in this case. Additionally, even accepting 9.03% as an appropriate benchmark, the Commission found that the comparison between this rate and the rate actually being earned by PEPCO failed to demonstrate the necessity of ex-

8. The data accompanying PEPCO's initial application for emergency relief indicated that for the twelve month period ending April 30, 1979, PEPCO's return on its District of Columbia rate base was 6.86%. As adjusted to conform with the conclusions set forth in the Commission's final order in Formal Case 685, and assuming the 5.89 million increase granted in that case had been in effect for the entire twelve month period ending in April, PEPCO's return would have been 7.72%. This later figure is consistently cited by the parties as PEPCO's actual rate of return for the period ending April 30, 1979.

9. On the contrary, testimony and supplemental filings to the first application show that PEPCO was able to raise necessary capital and that its financial status was secure. *See infra* pp. 787–788.

10. In the hearing held on Pepco's initial application, the only mention of the Company's ina-

bility to raise capital appears in the following testimony of W. Reid Thompson:

A statement was made by counsel for the staff that PEPCO was seeking a guaranteed rate of return. I would say to the Commission, as the figures show filed here, if this application is today granted in full, effective August 1, our figures show an *anticipated return* of 7.96 for the year 1979, still in our view substantially less than the reasonable return found by this Commission.

Now, I say to the Commission that the application of these facts alleged here show that there is, show that presently, that this utility is unable to obtain necessary capital funds on a *reasonable basis* to finance the continued construction necessary to serve its customers *based on these* results.

In fact, PEPCO seems to have had little difficulty raising capital. *See infra* pp. 787–788.

traordinary action in the form of emergency relief.

As a matter of law, nothing requires the Commission to use its previously authorized rate of return as the sole indicator of PEPCO's present "reasonable rate of return". Given certain circumstances, it may be useful for the Commission to adhere to a prior rate of return finding as an appropriate standard against which to measure a utility's need for immediate emergency relief. *See, e.g., In re Washington Gas Light Co.,* PSC Order No. 5666 (July 11, 1974). Yet, the prior determination made in the context of a different case and on the basis of different test year data is not *res judicata* as to the authorized rate of return in the context of a new case concerning a different time period. *State ex rel. Utilities Commission v. Duke Power Company,* 285 N.C. 377, 395–96, 206 S.E.2d 269, 281 (1974); *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 354 A.2d 753, 768–70 (Me.1976). Thus, it was not error for the Commission to rule that its previous rate of return decision was not the benchmark of reasonableness as PEPCO alleged.

Even assuming that it was bound by its prior decision concerning authorized rate of return, the Commission found that the actual rate of return experienced by PEPCO was not so substantially less than reasonable so as to constitute an emergency. We cannot say that this decision was arbitrary and capricious. There is no evidence other than a 1.31% gap between a previously authorized rate of return and a present actual rate of return that indicates emergency conditions. Where the Commission has previously granted emergency relief, the discrepancy between authorized and actual rates of return had resulted in severe difficulties for the utility not present in the record of this case. *See Re Potomac Electric Power Co.,* 82 PUR3d 209 (D.C.P.S.C. 1970) (PEPCO experiencing recurrent difficulties in generating sufficient power to meet peak demand; brownouts and voltage reductions had occurred); *In re Washington Gas Light Co.,* PSC Order No. 5655 (July 11, 1974) (WGL actual rate of return was 4.50% as compared to an authorized rate of return of 8.23%; bond and preferred stock coverages were below legally required levels and earnings had been below dividend rate for substantial period). Further, there is no evidence in this case that the 1.31% gap between the authorized and actual rates of return had or would have any such debilitating effects. As the Commission has previously indicated, it is not the purpose of emergency rate relief simply to close the gap between a return previously authorized and actual earnings. Rather, the purpose of emergency relief is to alleviate financial problems whose correction cannot safely await a decision on the proper level of permanent rates. Thus, the Commission has previously denied emergency relief where the discrepancy between the actual and authorized rate of return was more substantial than in this case. *See Re Potomac Electric Power Co.,* 95 PUR3d 99 (D.C.P.S. C.1972) (emergency relief denied when actual rate of return was 6.65% as compared to previously authorized rate of return of 7.84%); *Re Chesapeake and Potomac Telephone Co.,* 95 PUR3d 339 (D.C.P.S.C.1972) (emergency relief denied where actual rate of return was 5.80% compared to previously authorized rate of 8.50%); *In re Washington Gas Light Co.,* PSC Order No. 5627 (Feb. 14, 1974) (emergency relief denied where actual rate of return was 5.19% as compared to previously authorized rate of 8.23%).

IV. CONFISCATION OF PEPCO PROPERTY

The structure of PEPCO's proof of confiscation is the same as its proof that the Commission violated its statutory mandate by denying emergency rate relief. PEPCO presented to the Commission expense and revenue data based upon the test year ending April 30, 1979, to which it applied the principles utilized by the Commission in its most recent permanent rate order determination. The results established that PEPCO was actually earning

only a 7.72% rate of return under those permanent rates for the adjusted test year. To the extent that this rate of return was less than the rate of return which the Commission had authorized in its most recent order relating to permanent rates, PEPCO claimed that it had proven, *ipso facto,* that it was suffering confiscation. We are satisfied that the Commission did not err in rejecting this argument. We so conclude because we reject the validity of the foundational premise upon which PEPCO's claim of confiscation rests: that the 9.03% fair rate of return authorized by the Commission in establishing permanent rates in Formal Case 685, represents the minimum nonconfiscatory rate of return for PEPCO during the period before new permanent rates are established. A utility is authorized to earn a rate of return; it is not guaranteed a specific rate of return for all future periods. *Chesapeake & Potomac Telephone Co. v. Public Service Commission, supra* at 242. Thus, an actual rate of return that is lower than the most recent previously authorized rate of return is not *per se* unjust or unreasonable. *Mountain States Telephone & Telegraph Co. v. Public Utilities Commission,* 345 F.Supp. 80 (D.Colo.1972); *South Central Bell Telephone Co. v. Louisiana Public Service Commission,* 272 So.2d 667 (La.1973); *New England Telephone & Telegraph Co. v. Public*

*Service Commission, supra; State ex rel. Laclede Gas Co. v. Public Service Commission,* 535 S.W.2d 561 (Mo.App.1976), *Contra Southern Bell Telephone & Telegraph Co. v. Bevis,* 279 So.2d 285 (Fla.1973). The risk that its own inefficiency or external business may prevent the utility from achieving a specified rate of return is allocated to PEPCO.[11] *Chesapeake & Potomac Telephone Co. v. Public Service Commission, supra* at 242. The mere failure to earn a previously authorized rate of return imposes no obligation upon the Commission to grant a rate increase.

███ In other words, the question of whether PEPCO's rates are unjust and unreasonable does not depend on the degree of difference between the actual and previously authorized rates of return. Under the Public Service Commission Law, D.C.Code 1981, § 43–301, *et seq.,* and the fifth amendment to the United States Constitution, the District of Columbia Public Service Commission is required to establish utility rates which are "reasonable, just and non-discriminatory." The Commission is not required to adopt as "just and reasonable" any particular rate level. Rather, this constitutional and statutory mandate allows the Commission broad discretion to set rates, without judicial interference, provided that the rates fall within a "zone of reasonableness." [12] *Metropolitan Wash-*

---

**11.** Some jurisdictions provide the utilities with an entitlement to interim or emergency rate relief whenever earnings fall below a previously authorized rate of return. *See, e.g.,* Md.Ann. Code, art. 78, § 69B (1980); Fla.Stat. § 366.-06(4). Yet, neither this jurisdiction's present law nor the Fifth Amendment entitle the utilities to increased revenues on this basis.

This is not to say that we are unconcerned about the effect of regulatory lag on a utility's earnings pending the disposition of its permanent rate application. Rather, we think that the existing protections are constitutionally adequate. The Commission has pledged to remedy interim revenue deficiencies that threaten the utility's ability to raise necessary capital or meet its public service obligation pending Commission decisions on permanent rates. Furthermore, the Commission has pledged to consider the revenue deficiency problem when establishing new permanent rates. As the Com-

mission stated when it denied PEPCO's second application for emergency relief:

> ... the appropriate avenue of relief for PEPCO's claim of a failure or inability to earn the return authorized in Formal Case 685 is the prosecution of its permanent rate application now pending before us ... we have endeavored ... to expedite the resolution of the permanent increase request and to minimize regulatory lag .... The claimed deficiency of PEPCO's return on D.C. rate base, short of circumstances constituting an emergency, is a central issue in the permanent rate case, as it usually is in all such proceedings. [Order 7038 in Formal Case 715 (Sept. 21, 1979).]

**12.** This zone is bounded on the one side by the interests of utility customers in not paying exorbitant rates. *See Washington Gas Light Co. v. Baker, supra* at 119, 188 F.2d at 15. On the other side are the interests of utility investors in achieving a rate of return sufficient to main-

*ington Board of Trade v. Public Service Commission, supra* at 350–52. *See also In re Permian Basin Area Rate Cases, supra* at 767; *Washington Gas Light Co. v. Baker,* 88 U.S.App.D.C. 115, 119, 188 F.2d 11, 15 (1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 572, 95 L.Ed. 686, *appeal after remand,* 90 U.S.App.D.C. 98, 195 F.2d 29 (1951). Thus, the question of confiscation must focus on whether the level of rates which remained in effect during the period in question, due to the Commission's denial of emergency relief, are below the reasonable range; whether the actual rate of return earned by PEPCO is so low as to deprive PEPCO of the opportunity to maintain its financial integrity, to attract necessary capital and to compensate investors fairly.

■■■ The record in this case adequately supports the PSC conclusion that the actual rate of return is not this low.[13] For instance, the Company was able to raise necessary capital. In August 1979, PEPCO completed the refinancing of its intermediate term pollution control debt (Supp.Rec. at 17) and sold $35 million worth of new preferred stock (Supp.Rec. at 202, 405). PEPCO's fixed charge coverage on outstanding debt—the ratio of earnings available for interest and property retirement—was 2.86 for the twelve months ending April 30, 1979, and was 2.92 for the period ending June 30, 1979 (Supp.Rec. at 201). Both of these figures were above PEPCO's indenture requirements, insuring the marketability of future debt issues. Moreover, investors were being fairly compensated. During the period in question, the utility continued to pay dividends to its preferred and common stockholders (Supp.Rec. at 345). PEPCO's actual earnings for the twelve month period ending April 1979, were above the Company's common stock dividend rate (Supp.Rec. at 15, 20). Finally,

the Company was able to maintain its financial integrity. PEPCO's bond coverage continued to be in excess of required coverage (Supp.Rec. at 207). There was no immediate threat to the high ratings enjoyed by PEPCO bonds and senior securities. The record fails to contain any indication that PEPCO was unable to cover its present operating expenses or that it would have any difficulty in providing adequate electricity to its customers during the remaining hot summer months should their emergency application be denied. In other words, considered as a whole, there is substantial evidence to support the Commission's finding that the actual rate of return earned by PEPCO was not so low as to either threaten the Company with financial disarray or to effect a confiscation of property during the period before a new permanent rate increase could be approved.

## V. DISMISSAL OF PEPCO's SECOND APPLICATION FOR EMERGENCY RELIEF WITHOUT A HEARING

PEPCO's first application for emergency rate relief was the subject of a Commission hearing on July 23, 1979. At that hearing, PEPCO President and Chairman of the Board, W. Reid Thompson, and PEPCO General Vice President of Finance, H. Lowell Davis, testified in favor of PEPCO's application. Thereafter, the Commission granted intervenors' motions to dismiss. When PEPCO failed to demonstrate to the Commission's satisfaction that its second application for emergency rate relief involved any factual or legal grounds neither similarly relied upon in its first application nor considered in the hearing, the Commission dismissed the second application without a hearing. PEPCO challenges this dismissal as a violation of its due process rights.

---

tain the utility's financial integrity, to permit the utility to attract necessary capital at a reasonable cost, and fairly to compensate themselves for the risks they have assumed. *Federal Power Commission v. Hope Natural Gas Co., supra* 320 U.S. at 603, 64 S.Ct. at 288; *In re*

*Permian Basin Area Rate Cases, supra* 390 U.S. at 791–92, 88 S.Ct. at 1372–1373.

**13.** The record referred to in the text is that pertaining to the second application for emergency rate relief, and to supplemental filings to the first application.

■ If PEPCO's second application relied on the same facts and legal contentions considered by the Commission in dismissing the first application, the Commission has the power to dismiss it without a hearing. A hearing is not necessary where no material facts are in dispute or where the disposition of claims turn not on the determination of facts, but inferences and legal conclusions to be derived from facts already established. *Citizens for Allegan County Inc. v. Federal Power Commission,* 134 U.S.App. D.C. 229, 232, 414 F.2d 1125, 1128 (1969); *Anti-Defamation League of B'nai B'rith v. Federal Communications Commission,* 131 U.S.App.D.C. 146, 403 F.2d 169 (1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969). Having sustained the Commission's decision that PEPCO's first application failed to establish a *prima facie* case for emergency relief, absent additional or supervening facts, the Commission can enforce repose by invoking the doctrine of preclusion by judgment against PEPCO. Subsequent applications involving the same facts and issues existing at the time of the first Commission decision and actually considered by the Commission, need not be re-litigated. *See Stuckey v. Weinberger,* 488 F.2d 904, 911–12 (9th Cir.1973) (applying res judicata to bar hearings on subsequent applications for disability benefits before the Secretary of Health, Education, and Welfare). Indeed, PEPCO's challenge to the Commission's dismissal of its second application without a hearing is somewhat ironic since another hearing on the same facts and issues existing at the time of the first application would only further delay disposition of the utility's permanent rate case. This delay, in turn, would increase the utility's revenue loss pending disposition of its permanent rate case.

■ We have reviewed both of PEPCO's applications for emergency relief as well as the hearing held pursuant to the first application. We have also reviewed PEPCO's statement, submitted in response to the Commission's request, outlining the factual and legal grounds relied upon in its second application that were not similarly relied upon in its first application. We can find nothing in PEPCO's second application which indicates that its financial situation had changed since the denial of its first application. Nor does the second application present any additional facts evidencing an emergency that, due to oversight, were not presented in the initial application. In fact, the two applications present almost identical issues for the Commission's review. Therefore, there was no requirement for the Commission to repeat its earlier hearing.

*Affirmed.*

NEBEKER, Associate Judge, dissenting:

Once again it appears that the majority's resolution of this petition of appeal sanctions the proposition that "the Commission will conclude that virtually any treatment of a utility which purports to be 'pro-consumer' in nature is likely to escape perceptive judicial review." *Potomac Electric Power Co. v. Public Service Comm'n,* 402 A.2d 14, 27 (D.C.1979) (Harris, J., dissenting). This "hear no evil, see no evil" approach to appellate review continues to evidence an alarming lethargy. The Commission's obligation is not merely the protection of consumer interests, but rather requires a *balancing* of investor and consumer interests, *Potomac Electric Power Co. v. Public Service Comm'n,* 380 A.2d 126, 132 (D.C.1977), and its actions must be considered in this light. The Commission is charged with the duty of insuring the prolonged economic health of the utility, one aspect of which entails the overall responsibility to insure that the utility be given the opportunity to earn a fair rate of return. *Id.* at 131–32. *See Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *McCardle v. Indianapolis Water Co.,* 272 U.S. 400, 408–09, 47 S.Ct. 144, 147–148, 71 L.Ed. 316 (1926); *Bluefield Water Works & Improvement Co. v. Public Service Comm'n,*

262 U.S. 679, 690, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923). As narrow as our jurisdictional stance may be, as a court sitting in review of a rate order allegedly unjust and unreasonable in its total effect, we must "delve into the details of the order" and "give reasoned consideration to each contested element of the rate order 'to determine the possible presence of arbitrary action.'" *Potomac Electric Power Co. v. Public Service Comm'n, supra,* 380 A.2d at 132. This the majority failed to do.

Initially, PEPCO is faulted by the Commission and this court for failing to direct its application for interim rate relief to anything other than its experience of earnings substantially less than that which is reasonable. Specifically, PEPCO allegedly erred by not demonstrating either "a present or clearly imminent threat that the Company will be unable to continue meeting its public service obligation" or "a present or clearly imminent threat that the Company will be unable to obtain necessary capital funds to finance the construction of necessary new or replacement plants." In fact, the Commission was presented with evidence of both of these factors relating to the "D.C. PEPCO" operations. While there is no such entity as "D.C. PEPCO" in a concrete sense—PEPCO's operations extending into Maryland and Virginia—for purposes of ratemaking proceedings, PEPCO's operations in other jurisdictions must be ignored. *Capital Transit Co. v. Public Utilities Comm'n,* 213 F.2d 176, 182 (D.C. Cir.1954). It is not axiomatic that because the Company as a whole is capable of obtaining necessary capital funds and meeting its public service obligations that "D.C. PEPCO" is sound. The record evidence relied upon by the majority to illustrate PEPCO's financial stability reflects PEPCO's operations *systemwide.* The results, therefore, are skewed against the Company's position presented in its interim request as the Company's Maryland and Virginia operations were on sounder financial ground. A decision by the Commission based upon these figures is both arbitrary and capricious and cannot be upheld.

Secondly, the majority cavalierly characterizes PEPCO's position as being a "make whole" request by declaring that "it is not the purpose of emergency rate relief ... simply to close the gap between a return previously authorized and actual earnings. Rather, the purpose of emergency relief is to alleviate financial problems whose correction cannot safely await a decision on the proper level of permanent rates." This approach ignores PEPCO's contention that, rather than attempting to secure a *guaranteed* rate of return, it merely seeks the *opportunity* to realize the authorized rate of return. The Commission was presented both with figures and testimony to the effect that even if the interim relief were granted in full immediately, PEPCO's anticipated return would be but 7.96 percent for the year 1979. Given that the Commission authorized a 9.03 percent rate of return but days earlier, PEPCO's interim request cannot justifiably be characterized as "make whole."

Finally, the Commission took the position that it was inappropriate to use the previously authorized rate of return as the presumptively reasonable rate of return for the interim rate increase request. Given the posture of this case, such a position is untenable. Formal Case No. 685, a permanent rate increase case which had been pending for over a year and a half, resulted in a determination that a 9.03 percent rate of return was just and reasonable. The proposed order in Formal Case No. 685 was but a week old at the time of PEPCO's initial interim rate request. To fail to give any weight to the result reached in Formal Case No. 685 with regard to a reasonable rate of return defies rational explanation. *See* Formal Case No. 610, *In Re Washington Gas Light Co.,* Order No. 5655, at 9, July 11, 1974. The proceedings relating to interim relief requests should not so parallel permanent rate increase procedures that the harm

befalling the utility exacerbates unnecessarily pending the outcome. This is especially true given the realities of the day—rampant inflation, regulatory lag, attrition—which affect the utility's ability to maintain sound financial footing. Absent some reason to the contrary, the Commission should have acknowledged the newly set rate of return as a valid benchmark for the determination of a just and reasonable rate.

I respectfully dissent.