# District of Columbia
# Court of Appeals

**Nos. 15-AA-301 & 15-AA-302**

APARTMENT AND OFFICE BUILDING ASSOCIATION OF
     METROPOLITAN WASHINGTON,
                           Petitioner,



FILED
JAN **14** 2016
DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA,
                           Respondent,

    &                                    **FC-1116-14 &**
                                             **FC-1121-14**

OFFICE OF THE PEOPLE'S COUNSEL,
     DISTRICT OF COLUMBIA DEPARTMENT OF TRANSPORTATION and
     POTOMAC ELECTRIC POWER COMPANY,
                           Intervenors.

On Petition for Review of Orders of
The Public Service Commission of the District of Columbia

BEFORE:  Easterly and McLeese, Associate Judges; and Farrell, Senior Judge.

## J U D G M E N T

This case came to be heard on the administrative record, certified copy of the agency hearing transcript, the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the orders of the Public Service Commission of the District of Columbia are affirmed.

                          For the Court:

                          *Julio A. Castillo*

                          JULIO A. CASTILLO
                          Clerk of the Court

Dated: January 14, 2016.

Opinion by Associate Judge Roy W. McLeese.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

FILED 1/14/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 15-AA-301 & 15-AA-302

APARTMENT AND OFFICE BUILDING ASSOCIATION OF METROPOLITAN WASHINGTON, PETITIONER,

v.

PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA, RESPONDENT,

and

OFFICE OF THE PEOPLE'S COUNSEL, DISTRICT OF COLUMBIA DEPARTMENT OF TRANSPORTATION, and POTOMAC ELECTRIC POWER COMPANY, INTERVENORS.

On Petitions for Review of Orders of the Public
Service Commission of the District of Columbia
(FC-1116-14 & FC-1121-14)

(Argued November 3, 2015                    Decided January 14, 2016)

*Vincent Mark J. Policy*, with whom *Frann G. Francis* was on the brief, for petitioner.

*Christopher G. Lipscombe*, Attorney Advisor, with whom *Richard A. Beverly*, General Council, and *Naza N. Shelley*, Attorney Advisor, were on the brief, for respondent.

*John Michael Adragna*, *Kevin J. Conoscenti*, *Sandra Mattavous-Frye*, *Karen R. Sistrunk*, and *Travis R. Smith* were on the brief for intervenor Office of the People's Counsel.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Loren L. AliKhan*, Deputy Solicitor General, and *James C. McKay, Jr.*, Senior Assistant Attorney General, were on the brief for intervenor District of Columbia Department of Transportation.

*Peter E. Meier*, with whom *Wendy E. Stark*, *Andrea H. Harper*, and *Dennis P. Jamouneau*, were on the brief, for intervenor Potomac Electric Power Company.

Before EASTERLY and MCLEESE, *Associate Judges*, and FARRELL, *Senior Judge*.

MCLEESE, *Associate Judge*:  In 2014, the Council of the District of Columbia authorized intervenors Potomac Electric Power Company (Pepco) and District of Columbia Department of Transportation (DDOT) to work together to move overhead electrical-power lines underground.  Electric Company Infrastructure Improvement Financing Act of 2014 (ECIIFA), D.C. Code § 34-1311.01 et seq. (2015 Supp.), *amended by* D.C. Code Ann. § 34-1311.01 (8A) (West, Westlaw through Nov. 30, 2015).  The project is expected to take seven to ten years to complete and to cost approximately $1 billion.  Petitioner Apartment and Office Building Association of Metropolitan Washington (AOBA) seeks review of orders of respondent Public Service Commission of the District of Columbia allocating the costs of the project among Pepco's customers.  We affirm.

**I.**

ECIIFA allows Pepco and DDOT to recover the costs of the undergrounding project in two ways. First, Pepco can impose "DDOT Underground Electric Company Infrastructure Improvement Charges" (DDOT charges) on certain Pepco customers. D.C. Code § 34-1313.01 (a)(4). The revenue from DDOT charges is to be used to pay the principal and interest on bonds issued by the District of Columbia to finance aspects of the project. D.C. Code §§ 34-1311.01 (13), 34-1312.01 to -1312.12. Second, Pepco can impose "Underground Project Charges" (UPCs) on certain of its customers in order to recover costs that Pepco itself incurs on the project. D.C. Code §§ 34-1311.01 (21) and (42), 34-1313.10 (c)(1). Both types of undergrounding charge must be approved by the Commission as part of triennial plans submitted by Pepco and DDOT. D.C. Code §§ 34-1313.01 to -1313.15.

The undergrounding charges are allocated among Pepco's customers using a single formula. *See* D.C. Code §§ 34-1313.01 (a)(4), 34-1313.10 (c)(1). Specifically, the charges are to be recovered in the form of a "volumetric surcharge," i.e., a surcharge tied to the amount of electricity each customer uses. D.C. Code §§ 34-1313.01 (a)(4), 34-1313.10 (c)(2). The charges are to be

allocated among certain of Pepco's customer classes "in accordance with the distribution service customer class cost allocations approved by the Commission for the electric company . . . [in or pursuant to the] most recent base rate case." D.C. Code §§ 34-1313.01 (a)(4), 34-1313.10 (c)(1).

"Base rate cases" are proceedings in which the Commission decides whether and how to modify electricity-rate designs to serve various regulatory goals. *See Formal Case No. 1116, Application for Approval of Triennial Underground Infrastructure Improvement Projects Plan*, Order No. 17697 ¶ 189 (Pub. Serv. Comm'n Nov. 12, 2014) (hereinafter "Order No. 17697"). In a base rate case, the Commission can distribute the burden of meeting Pepco's revenue requirements among Pepco's customer classes, taking into consideration factors such as the amounts of electricity used by various customer classes, the number of customers in the classes, and the existing rates of return for the classes. *See Formal Case No. 1103, Application of Potomac Elec. Power Co. for Authority to Increase Existing Retail Rates & Charges for Elec. Distrib. Serv.,* Order No. 17424 ¶¶ 385-86 (Pub. Serv. Comm'n Mar. 26, 2014) (hereinafter "Order No. 17424"); *Formal Case No. 1116, Application for Approval of Triennial Underground Infrastructure Improvement Projects Plan*, Order No. 17769 ¶ 56 (Pub. Serv. Comm'n Jan. 22, 2015) (hereinafter "Order No. 17769").

The parties agree that Formal Case 1103 is the "most recent base rate case" for purposes of determining how to apportion the undergrounding charges. The Commission concluded Formal Case 1103 on March 26, 2014, after the enactment of ECIIFA but before ECIIFA's effective date of May 3, 2014. *See* Order No. 17424 at 1; Electric Company Infrastructure Improvement Financing Act of 2014, D.C. Act 20-290, § 503, 61 D.C. Reg. 1882 (Mar. 3, 2014); D.C. Law 20-102, 61 D.C. Reg. 5193 (May 3, 2014).

In Formal Case 1103, the Commission considered a variety of ratemaking adjustments requested by Pepco, along with a request to increase the revenue collected from Pepco's customers. *See* Order No. 17424 ¶ 566. Pepco initially requested a total revenue increase of $44,816,000, to recoup investments in infrastructure that Pepco described as needed to "improve the resiliency of its system in order to provide reliable service to its customers." *Id.* ¶ 8. The Commission approved a revenue increase of $23,448,000. *Id.* ¶¶ 13, 566. The Commission also addressed how the burden of paying for the revenue increase should be allocated among Pepco's customer classes. *Id.* ¶¶ 410-38. The Commission concluded that there "were significant disparities in customer class [rates of return] that warrant corrective action," *id.* ¶ 410, and that Pepco's

commercial customer classes had been substantially subsidizing the costs of services for residential customers. *Id.* ¶ 438. In an effort to address this issue, the Commission decided that forty-seven percent of the total revenue increase would be allocated to residential customer classes. *Id.* ¶ 437.

The Commission decided to direct Pepco to collect the additional revenues allocated to residential customer classes through increases to customer charges, rather than through increases to volumetric charges. Order No. 17424 ¶ 450. For example, the monthly customer charge for Pepco's "Residential R" class was increased by $3.75, resulting in a total per-month charge of $13. *Id.* ¶ 451. The Commission found that the new customer charges approved for residential customer classes in Formal Case 1103 remained "well below the actual fixed costs of serving each of these [] customer classes." *Id.* ¶ 451. The volumetric charges for those classes of residential customers remained unchanged. *Cf. id.* ¶¶ 450-51.

In June 2014, Pepco and DDOT sought approval of their first three-year plan for the undergrounding project. *See* Order No. 17697 ¶ 5; *Formal Case No. 1121, Application of Potomac Electric Power Co. for a Financing Order*, Order No. 17714 ¶ 6 (Pub. Serv. Comm'n Nov. 24, 2014) (hereinafter "Order No. 17714"). Among other things, the application requested approval of a UPC. Order No.

17697 ¶ 5. Pepco and DDOT proposed to allocate the UPC based on the "volumetric allocation of rates determined in Formal Case No. 1103, [] exclud[ing] the customer charge component." Order No. 17697 ¶ 97 (emphasis omitted). This proposal did not include the customer charge revenue approved in Formal Case 1103 because, according to Pepco, customer charges are typically used to recover costs such as billing and metering, not the types of costs associated with the undergrounding project. *Id.* ¶ 186. Pepco and DDOT's proposal allocated approximately eighty-nine percent of the burden of the UPC to commercial customer classes and approximately eleven percent of the burden of the UPC to residential customer classes. *Id.* ¶ 183.

AOBA opposed Pepco's proposed allocation, raising two alternative arguments. First, AOBA argued that the burden of the UPC should be allocated based on a study of the costs of providing service to various classes of customers that Pepco had prepared in connection with Formal Case 1103. Order No. 17697 ¶¶ 47-48. Second, AOBA argued that the customer charge approved in Formal Case 1103 had to be included in Pepco's proposed allocation, because that charge was one of the "distribution service customer class cost allocations" approved in Formal Case 1103. *Id.* ¶ 185. Under AOBA's reading of the statute, commercial

customers would have borne a smaller percentage of the burden of the UPC than under Pepco's proposal. *Cf. id.* ¶¶ 47-51.

In Formal Case 1116, the Commission adopted Pepco's proposed approach, agreeing that customer charges should not be included in the UPC cost allocation. Order No. 17697 ¶ 187. An essentially identical issue arose in Formal Case 1121 with respect to the allocation of the burden of the DDOT charge. Order No. 17714 ¶¶ 39, 42, 77. The Commission resolved that issue as it had in Formal Case 1116. *Id.* ¶¶ 77-78.

In this court, AOBA challenges the Commission's cost-allocation decisions, arguing that the Commission misconstrued ECIIFA. After AOBA submitted its initial brief in this court, the Council of the District of Columbia amended ECIIFA by providing a definition of the disputed language in this case. *See* D.C. Code Ann. § 34-1311.01 (8A). The amendment defines the term "[d]istribution service customer class cost allocations" as "the allocation of the electric company's revenue requirement to each customer rate class on the basis of the total rate class distribution service revenue minus the customer charge revenue." *Id.* The Council made the amendment effective as of May 3, 2014 -- the same day that ECIIFA

originally took effect. Fiscal Year 2016 Budget Support Act of 2015, D.C. Act 21-148, § 2103, 62 D.C. Reg. 10940 (Aug. 11, 2015).

The Commission argues that the definition in the amendment renders academic any dispute over the proper interpretation of ECIIFA as originally enacted. AOBA disagrees, arguing that the amendment does not apply to the orders on review in these proceedings and that the court must at the very least remand the case to allow the Commission to determine in the first instance the impact of the amendment.

## II.

Review in this court of Commission orders is governed by D.C. Code § 34-606 (2012 Repl.), which provides that:

> [In] any appeal from an order or decision of the Commission the review by the Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

This court's review of ratemaking orders of the Commission is the "narrowest [] in the field of administrative law," because "[t]he Commission, not this court, has the sole responsibility for balancing consumer and investor interests

in designing rate structures and approving specific charges." *Potomac Elec. Power Co. v. Public Serv. Comm'n*, 457 A.2d 776, 782 (D.C. 1983). If there is "substantial evidence to support the Commission's findings and conclusions and the Commission has given reasoned consideration to each of the pertinent factors, we must affirm." *Id.*

Generally, "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *NBC v. District of Columbia Comm'n on Human Rights*, 463 A.2d 657, 663 (D.C. 1983) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). Thus, if a party asks this Court to affirm an agency order based upon a ground that was not considered by the agency, we ordinarily must remand for the agency to consider the new ground in the first instance. *See, e.g.*, *Jones v. District of Columbia Dept. of Emp't Servs.*, 519 A.2d 704, 709 (D.C. 1987). This principle is subject to some exceptions, however. Specifically, remand is not required in cases where the agency would doubtless reach the same result and reaffirm its prior order, *Le Chic Taxicab Co. v. District of Columbia Taxicab Comm'n*, 614 A.2d 943, 945 (D.C. 1992), or because "it is clear what the agency's decision has to be." *Bio-Med. Applications of District of Columbia v. District of Columbia Bd. of*

*Appeals & Review*, 829 A.2d 208, 217 (D.C. 2003) (internal quotation marks omitted).

## III.

We turn first to whether the recent amendment to ECIIFA applies to the current proceedings. Based on the amendment's effective date, the context and timing of the amendment's adoption, and the substance of the amendment, we conclude that the amendment does apply. First, although the amendment was enacted in 2015, the Council made the amendment applicable "as of May 3, 2014," the original effective date of ECIIFA. D.C. Act 21-148, § 2103, 62 D.C. Reg. 10940. The Council thus directed that the amendment be treated as if it had been included in ECIIFA as originally enacted in 2014. It follows that the Council intended the amendment to apply to all claims and proceedings arising under ECIIFA, as would ordinarily have been the case if the amendment had in fact been part of ECIIFA as originally adopted. *Cf., e.g.*, *Davis v. Moore*, 772 A.2d 204, 228 (D.C. 2001) (en banc) (legislation is presumptively prospective in application); *In re Ancillary Liquidation of Integrity Ins. Co.*, 580 N.W.2d 348, 352 (Wis. 1998) (statute was applied prospectively when applied to "claims which arose and were filed after its effective date"). The decision to make the amendment effective as of

May 3, 2014, unequivocally demonstrates the Council's intent to make the amendment applicable to these proceedings.

Second, the context and timing of the amendment confirm that the Council intended the amendment to apply to the current proceedings. As we have noted, the Commission issued orders in November 2014 approving Pepco's proposal to allocate the undergrounding charges based on the cost allocations approved by the Commission in Formal Case 1103, but excluding the customer charges. Order No. 17697 at 1 & ¶ 187; Order No. 17714 at 1 & ¶¶ 77-78. After unsuccessfully seeking reconsideration before the Commission, AOBA sought review in this court in March 2015. The Council responded soon thereafter. In May 2015, the Committee on Business, Consumer, and Regulatory Affairs recommended that the Council enact new legislation to clarify the methodology to be used in allocating the costs of the undergrounding project, noting that, "[d]ue to ongoing litigation, the District is unable to obtain financing and begin the underground[ing] process." D.C. Council, Comm. on Bus., Consumer, & Regulatory Affairs, Rep. & Recommendations of Comm. on Fiscal Year 2016 Budget for Agencies Under Its Purview, at 90 (May 13, 2015). In July 2015, a little more than a month after AOBA filed its opening brief in this court, the Council enacted emergency legislation amending ECIIFA to define the language at issue in these proceedings.

Fiscal Year 2016 Budget Support Emergency Act of 2015, D.C. Act 21-127, § 2102; 62 D.C. Reg. 10237 (Jul. 27, 2015). Permanent legislation containing the same definition was enacted in August 2015 and became law, after the congressional review period, in October 2015. Fiscal Year 2016 Budget Support Act of 2015, D.C. Act 21-148, § 2102, 62 D.C. Reg. 10940 (Aug. 11, 2015); 2015 D.C. Laws 21-36, § 2102 (West, Westlaw 2015). A Report by the Committee of the Whole noted that the amended definition "clarifies the cost allocation methodology to be used for purposes of [ECIIFA] to reflect the understanding of," inter alia, "the electric utility." D.C. Council, Comm. of Whole Rep. on Bill 21-158, Fiscal Year 2016 Budget Support Act of 2015, at 7 (May 27, 2015). This sequence of events confirms the Council's intent to make the amendment applicable to these proceedings.

Third, by its terms, the amendment appears to adopt the cost-allocation methodology that the Commission approved in Formal Cases 1116 and 1121. In Order No. 17697, for example, the Commission endorsed Pepco's proposed allocation of the UPC "to customer classes on the basis of the rate class specific levels of non-customer-related distribution revenue," subtracting "the customer charge from the cost allocation." Order No. 17697 ¶¶ 186-87. The Commission approved the same formula for allocation of the DDOT Charge. *See* Order No.

17714 ¶ 78. The amendment, which instructs the Commission to allocate the undergrounding charges based on "the total rate class distribution service revenue minus the customer charge revenue," D.C. Code Ann. § 34-1311.01 (8A), mirrors the formula approved by the Commission.

For the foregoing reasons, we conclude that the amendment to ECIIFA defining the term "distribution service customer class cost allocations" applies to the present proceedings. We are not persuaded by AOBA's arguments to the contrary.

First, AOBA argues that the evidence of the Council's intent is insufficient "to overcome the virtually conclusive presumption that legislation is not retroactive." It can be difficult to determine whether a given application of a new enactment would be retroactive in character. As the Supreme Court has explained:

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity.

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70 (1994) (citations omitted). We need not decide in this case, however, whether application of the amendment to these proceedings would be retroactive in character. For the reasons we have explained, the plain language and legislative history of the amendment would suffice to rebut any applicable presumption against retroactivity.

AOBA argues, however, that the amendment lacks the requisite clarity because the amendment does not explicitly state that it applies to pending proceedings. *Cf. District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 167, 174 (D.C. 2008) (discussing statute made explicitly applicable to cases pending on statute's effective date). Explicit reference to pending proceedings is a particularly clear way to express legislative intent. *See, e.g., Bank of Am., N.A. v. Griffin*, 2 A.3d 1070, 1074 (D.C. 2010) (statute at issue in *Beretta* was "just about the most clear legislative showing we can imagine") (internal quotation marks omitted). But AOBA cites no authority, and we know of none, holding that new enactments can apply to pending proceedings only if the legislature expressly refers to pending proceedings. To the contrary, legislatures are not required to use "magic words" when they intend a new enactment to apply to pending proceedings. *Cf., e.g., Bernier v. Data Gen. Corp.*, 787 A.2d 144, 150 (Me. 2002) ("we have never required an express reference to 'pending proceedings'" in order to apply statute to

proceedings pending on date of statute's enactment). Rather, as this court indicated in *Beretta*, it will suffice if the legislature has made its intent "clear." 940 A.2d at 174.

Second, AOBA suggests that the amendment is an impermissible attempt by the Council in 2015 to influence this court's interpretation of a provision enacted in 2014 by a differently constituted Council. We have said that "there is serious debate and doubt as to when, if ever, a later legislature has a role in construing what an earlier legislature intended." *Tippet v. Daley*, 10 A.3d 1123, 1131 (D.C. 2010) (en banc) (internal quotation marks omitted). The amendment in this case, however, is not a post-hoc attempt by the Council to influence this court's interpretation of ECIIFA as originally enacted. Rather, by making the amendment directly applicable to these proceedings, the Council has rendered academic the proper interpretation of ECIIFA as originally enacted and has instead required this court to interpret ECIIFA as amended.

Finally, AOBA contends in passing that applying the amendment to these proceedings "would deprive AOBA of its substantive right to a hearing before the Commission on the impact of the amendment." This contention provides no basis for concluding that the amendment is inapplicable to these proceedings. Rather,

any right AOBA may have to a hearing before the Commission could be satisfied if this court remanded these cases for the Commission to hold a hearing before applying the amendment. We therefore turn to whether AOBA has a right to such a hearing on remand.

## IV.

AOBA argues that, even if the amendment applies to these proceedings, this court cannot rely on the amendment to affirm the Commission's orders, because the Commission never considered the amendment in the first instance. AOBA thus asks the court at a minimum to remand the case to the Commission. As we have already noted, however, there are exceptions to the rule that this court may not affirm an administrative agency's ruling on grounds that were not relied upon by the agency. *See*, *e.g.*, *Le Chic Taxicab Co.*, 614 A.2d at 945 (remand not required where remand would be "pointless" because "it is apparent the [agency] would reach the same result"); *Bio-Med. Applications of District of Columbia*, 829 A.2d at 217 ("Although it could be argued that we should remand for the [agency] to consider itself whether the Draft Chapter is binding, we see no need to do so where it is clear what the agency's decision has to be. As the Supreme Court has

clarified, . . . courts [are not required] to remand in futility.") (internal quotation marks omitted).

This case involves both exceptions to the general rule requiring remand. For the reasons we have already described, the amendment unambiguously adopted what the Commission had already done in the orders under review. It is highly implausible that the Commission would do anything on remand other than reaffirm the conclusion it had already reached. Moreover, for the same reasons, if we were to remand, it would be "clear what the agency's decision has to be." *Bio-Med. Applications of District of Columbia*, 829 A.2d at 217.

AOBA argues, however, that we must remand to the Commission because the amended ECIIFA is ambiguous. We conclude otherwise. As previously noted, the amendment defines "[d]istribution service customer class cost allocations" as "the allocation of the electric company's revenue requirement to each customer rate class on the basis of the total rate class distribution service revenue minus the customer charge revenue." D.C. Code Ann. § 34-1311.01 (8A). When this definition is inserted into the ECIIFA provision governing the allocation of the DDOT charge, for example, the statute as amended reads as follows:

> Assess DDOT Underground Electric Company Infrastructure Improvement Charges among the distribution service customer classes of the electric company in accordance with the [allocation of the electric company's revenue requirement to each customer rate class on the basis of the total rate class distribution service revenue minus the customer charge revenue] approved by the Commission for the electric company and in effect pursuant to the most recent base rate case . . . .

D.C. Code § 34-1313.01 (a)(4).

AOBA argues that the amended statute is ambiguous in four respects. First, AOBA suggests that the amended statute inaccurately implies that the proceeds from the DDOT charge are revenue to Pepco, when in fact those proceeds must be used to finance bonds issued by the District of Columbia. The amended statute, however, does not treat the proceeds from the DDOT charge as revenue to Pepco. Rather, it simply directs the Commission, when allocating the costs of paying the DDOT charge, to follow the methodology that the Commission used in the most recent base rate case to allocate the burden of meeting Pepco's revenue requirement. D.C. Code § 34-1313.01 (a)(4); D.C. Code Ann. § 34-1311.01 (8A). Put differently, the mention in the amendment of Pepco's "revenue requirement" merely provides a point of reference for allocating among Pepco's consumers the costs of paying the DDOT charge.

Second, AOBA argues that the amended statute is ambiguous because the statute does not explicitly state whether the Commission may take steps in the undergrounding proceedings to address the fact that Pepco's commercial customer classes have generally been subsidizing the cost of services for residential customer classes. We see no ambiguity on that point. The amended statute directs the Commission to allocate the costs of the undergrounding project based on the allocation of costs in its most recent base rate case, minus the customer charge revenue. That directive does not leave room for the Commission in the undergrounding proceedings to independently address issues of subsidization. Of course, if the Commission in subsequent base rate cases elects to further address the issue of subsidization, then the allocation of costs utilized in those base rate cases could well affect the allocation of costs in future orders issued in connection with the undergrounding project. *See, e.g.*, D.C. Code § 34-1313.01 (a)(4).

Third, AOBA contends that the amended statute is ambiguous because it appears to imply that the Commission in Formal Case 1103 excluded customer charge revenues, when in fact the Commission approved such revenues. We do not agree with this reading of the amended statute. Sensibly interpreted, the amended statute requires that the cost allocation in the undergrounding proceedings be made "on the basis of the total rate class distribution service

revenue [approved by the Commission in the most recent base rate case,] minus the customer charge revenue [approved by the Commission in the most recent base rate case]."

Finally, AOBA suggested at oral argument that the Council, in amending ECIIFA to define "distribution service customer class cost allocations," was operating on the assumption that "customer charges" are exclusively used to recoup costs associated with services such as metering and billing. In fact, AOBA argues, the Commission in Formal Case 1103 permitted Pepco to use customer charges to recoup costs for a wide variety of other expenditures, including infrastructure improvements. AOBA thus appears to argue that the amended statute could be read to direct the Commission to exclude only those costs associated with metering and billing when determining how to allocate undergrounding charges. The difficulty with AOBA's argument on this point is that the amendment does not direct the Commission to independently determine in the undergrounding proceedings what kinds of costs are best recouped through customer charges and then to allocate undergrounding costs accordingly. Rather, the amended statute directs the Commission to take as a given the allocation of costs in the most recent base rate case. The Commission must use the revenue requirement allocated to each customer class in the most recent base rate case,

minus the customer charge revenue approved in the most recent base rate case, as the sole basis to allocate the costs of the undergrounding charges.  D.C. Code § 34-1313.01 (a)(4); § 34-1313.10 (c)(1); D.C. Code Ann. § 34-1311.01 (8A).  Any ambiguities as to how best to assign costs to customer classes or how best to design rates, including what kinds of costs are best treated as customer charges, thus must be left to future base rate cases and are not relevant in these undergrounding proceedings.

The Council provided for expedited appellate review of the Commission's final orders with respect to the undergrounding project.  D.C. Code § 34-1313.18 (2015 Supp.).  Moreover, the Council amended ECIIFA in part out of concern over the delay caused by the present litigation.  *See* Comm. on Bus., Consumer, & Regulatory Affairs, Rep. & Recommendations, at 90 (explaining that ongoing litigation was delaying start of undergrounding project).  Under the circumstances, and for the reasons we have already explained, remanding these proceedings would not be warranted.

The orders of the Commission are therefore

*Affirmed.*