*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-275

APARTMENT AND OFFICE BUILDING ASSOCIATION OF METROPOLITAN WASHINGTON, PETITIONER,

v.

PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA, RESPONDENT,

and

THE DISTRICT OF COLUMBIA,
THE PEOPLE'S COUNSEL OF THE DISTRICT OF COLUMBIA, and
POTOMAC ELECTRIC POWER COMPANY,
INTERVENORS.

On Petition for Review of Orders
of the Public Service Commission of the District of Columbia
(FC-1145-17)

(Argued September 20, 2018                           Decided March 7, 2019)

*Excetral K. Caldwell*, with whom *Frann G. Francis* was on the brief, for petitioner.

*Naza N. Shelley*, with whom *Christopher G. Lipscombe* and *Richard S. Herskovitz* were on the brief, for respondent.

*James C. McKay, Jr.*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Stacy L. Anderson*, Acting Deputy Solicitor General, were on the brief, for the District of Columbia, intervenor.

*Zachary C. Schauf*, with whom *Wendy E. Stark*, *Kim Hassan*, *Andrea H. Harper*, *Dennis P. Jamouneau*, and *David W. DeBruin* were on the brief, for Potomac Electric Power Company, intervenor.

*Sandra Mattavous-Frye*, People's Counsel, *Karen R. Sistrunk*, Deputy People's Counsel, and *Travis R. Smith, Sr.*, Trial Supervisor, filed a statement in lieu of brief.

*Kristi Singleton* was on the brief for *amicus curiae*, General Services Administration, in support of petitioner.

Before FISHER and THOMPSON, *Associate Judges*, and GREENE, *Senior Judge of the Superior Court of the District of Columbia.*[*]

FISHER, *Associate Judge*: Several powerful storms hit the District of Columbia area between 2003 and 2012, causing significant damage to the electrical distribution system and leaving many customers without power for long periods of time. A task force created in 2013 concluded that the frequency of power outages would decrease and consumers of electricity would benefit if overhead power lines were moved underground. Office of the Mayor, Gov't of D.C., *Mayor's Power Line Undergrounding Task Force Findings & Recommendations* at 5-6, 8-10 (Oct. 2013). The Council of the District of Columbia ("Council") decided to authorize this initiative in the Electric Company Infrastructure Improvement Financing Act of 2014 ("ECIIFA"), D.C. Code §§ 34-

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

1311.01–1315.01 (2015 Supp.); *see also* D.C. Law 20-102 (Act 20-290) (March 3, 2014).

This case arises from Public Service Commission ("Commission") orders which approved a plan identifying six electric feeder lines to be placed underground. The principal issue is the allocation of costs between commercial and residential customers. The Apartment and Office Building Association of Metropolitan Washington ("AOBA" or "Petitioner") asserts that the Commission failed to exercise its authority to allocate those costs, that the statute governing allocation contravenes the Home Rule Act, and that AOBA's due process rights were violated. We affirm the Commission's rulings.

## I. Procedural History

Debate concerning allocation of costs between residential and commercial customers had occurred in Pepco rate cases well before the undergrounding project began. Commercial customers protested that they were being required to subsidize services for residential customers. It was estimated that the first phase of the Undergrounding Initiative would cost approximately $500 million, and this high price tag renewed the debates about subsidization.

Sections 34-1313.01 and 34-1313.10 of the 2014 ECIIFA contained provisions requiring the Commission to allocate costs "in accordance with" "the electric company's most recent base rate case." D.C. Code § 34-1313.01(a)(4) (2015 Supp.) (the Commission "shall" assess charges for undergrounding "among the distribution service customer classes of the electric company in accordance with the distribution service customer class cost allocations approved by the Commission for the electric company and in effect pursuant to the most recent base rate case"); § 34-1313.10(c)(1) (2015 Supp.) (the Commission "shall" authorize the electric company to collect charges "in accordance with the distribution service customer class cost allocations approved by the Commission for the electric company and in the electric company's most recent base rate case").[1] In these provisions, the term "distribution service customer class cost allocations" was used

---

[1] Nearly identical allocation provisions are in the current statute as amended in July 2017. D.C. Code § 34.1313.01(a)(3) (2018 Supp.) (the Commission "shall" assess charges for undergrounding "among the distribution service customer classes of the electric company in accordance with the distribution service customer class cost allocations approved by the Commission for the electric company and in effect pursuant to the electric company's most recently decided base rate case"); D.C. Code § 34-1313.10(c)(1) (2018 Supp.) (the Commission "shall" authorize the electric company to collect charges for the underground project "in accordance with the distribution service customer class cost allocations approved by the Commission for the electric company and in the electric company's most recent base rate case").

but not defined, which led to confusion. *Id.*; *see also* D.C. Code § 34-1311.01 (2015 Supp.).

The Commission's first effort to allocate these costs, *Formal Case Nos. 1116 and 1121*, generated an appeal. AOBA challenged the Commission's cost allocation decisions and argued that the Commission had misconstrued the disputed term. *Apartment & Office Bldg. Ass'n of Metro. Washington v. Pub. Serv. Comm'n of the District of Columbia*, 129 A.3d 925, 929 (D.C. 2016).

In 2015, after AOBA submitted its initial brief in the previous appeal, the Council amended ECIIFA to include a definition of "distribution service customer class cost allocations." *Id.*; *see also* D.C. Code § 34-1311.01(8A) (2018 Supp.). We held that the newly amended statute applied to the pending appeal. 129 A.3d at 931. In addition, we held that the amended statute required the cost allocation to "be made on the basis of the total rate class distribution service revenue approved by the Commission in the most recent base rate case, minus the customer charge revenue approved by the Commission in the most recent base rate case." *Id.* at 934 (citing D.C. Code § 34-1313.01(a)(4); § 34-1313.01(c)(1); § 34-1311.01(8A)). In other words, "the amended statute directs the Commission to take as a given the allocation of costs in the most recent base rate case." *Id.*

This court emphasized that the Council's "directive [did] not leave room for the Commission in the undergrounding proceedings to independently address issues of subsidization." *Id.* We noted, however, that the Commission's allocation of costs in future base rate cases "could well affect the allocation of costs in future orders issued in connection with the undergrounding project." *Id.* (citing D.C. Code § 34-1313.01(a)(4)).

The project did not go forward at that time and the Council amended ECIIFA again effective July 11, 2017, to modify a portion of the funding structure. *See* D.C. Code §§ 34-1311.01–1315.01 (2018 Supp.). Under the statute, the Potomac Electric Power Company ("Pepco") and the District of Columbia Department of Transportation ("DDOT") are required to jointly file every two years an application for the Commission's approval consisting of a Biennial Underground Infrastructure Improvement Projects Plan and a Financing Order. D.C. Code § 34-1313.07(a) (Oct. 2017 Supp.). The Commission "may hold in abeyance or waive the obligation to file an application for approval" upon a finding of good cause as judged by certain enumerated criteria. *Id.* at § 34-1313.07(d).

Pepco and DDOT submitted their Joint Application to the Commission on July 3, 2017, initiating *Formal Case No. 1145*. They updated that application in August 2017. The Commission ultimately approved the proposed plan and denied motions for reconsideration.[2] Petitioner AOBA now challenges these and related orders. Pepco, the District of Columbia, and the Office of People's Counsel ("OPC") intervened in the case before this court, supporting the Commission.

## II.    Standard of Review

This court has jurisdiction to hear appeals from certain orders of the Public Service Commission of the District of Columbia. D.C. Code § 34-605 (2012 Repl.). Under D.C. Code § 34-606 (2012 Repl.), our scope of review is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings . . . are unreasonable, arbitrary, or capricious."

_____

[2] The Commission issued the following orders in this proceeding: Order No. 19806 on September 6, 2017 (incorporating records from *Formal Case Nos. 1116 and 1121* (the prior undergrounding proceeding) into the record for *Formal Case No.* 1145 over AOBA's objection); Order No. 19144 on October 20, 2017 (denying AOBA's request for a hearing); Order No. 19167 on November 9, 2017 (approving the proposed plan submitted by Pepco and DDOT); Order No. 19212 on December 20, 2017 (denying AOBA's first application for reconsideration); Order No. 19237 on January 18, 2018 (denying AOBA's second application for reconsideration).

This court reviews issues of statutory interpretation *de novo*. *Myerson v. United States*, 98 A.3d 192, 197 (D.C. 2014). In reviewing the Commission's orders, we must affirm "[i]f there is 'substantial evidence to support the Commission's findings and conclusions and the Commission has given reasoned consideration to each of the pertinent factors.'" 129 A.3d at 930 (citing *Potomac Elec. Power Co. v. Pub. Serv. Comm'n of D.C.*, 457 A.2d 776, 782 (D.C. 1983)). "Even if the court disagrees with the Commission, if the Commission has fully and clearly explained what it does and why it does it, and the agency decision is supported by substantial evidence, the court, upon a finding that the Commission order is reasonable in its overall effect, must sustain the order." 457 A.2d at 783-84 (citing *Washington Gas Light Co. v. Pub. Serv. Comm'n of the District of Columbia*, 450 A.2d 1187 (D.C. 1982)).

## III.  Analysis

## A. The Commission May Not Depart From the Allocation Structure in the Amended ECIIFA

AOBA contends that, ECIIFA notwithstanding, the Commission had discretion to address subsidization issues when allocating undergrounding costs and that it should have done so in this instance. However, the Commission recognized in Order Nos. 19167 and 19237 that the allocation of costs had been fixed in the "unequivocal statutory directive" of the amended ECIIFA. It had "no authority to alter the statutorily mandated allocation structure in the context of this proceeding"—the allocation of costs "must be in accordance with the allocation approved in Pepco's most recent base rate case." Because the proposed charges complied with the allocation structure in the amended ECIIFA, the Commission found that they were "just and reasonable."

AOBA disputes the Commission's view that it has no discretion to alter the allocation structure approved in Pepco's most recent base rate case. But this issue has already been litigated and decided. As explained above, this court ruled in the prior appeal that the statute "[did] not leave room for the Commission in the undergrounding proceedings to independently address issues of subsidization." 129 A.3d at 934. Under well-established principles of *res judicata*, this court will not consider that issue anew.[3]

---

[3] "In determining whether *res judicata* applies, '[w]e consider (1) whether the claim was adjudicated finally in the first action; (2) whether the present claim

(continued…)

Seeking to avoid this conclusion, AOBA claims that this language from our previous opinion was simply dictum because the issue of whether the Commission could depart from this allocation structure was not before this court at that time. That assertion is mistaken. In the prior case, AOBA asked us to remand so the Commission could determine the impact of the amended statute's definition of "distribution service customer class cost allocations." This court explained that remand was "pointless" because "the amendment unambiguously adopted what the Commission had already done in the orders under review [and] [i]t is highly implausible that the Commission would do anything on remand other than reaffirm the conclusion it had already reached." 129 A.3d at 933 (citing *Le Chic Taxicab Co. v. District of Columbia Taxicab Comm'n*, 614 A.2d 943, 945 (D.C. 1992); *Bio-Med. Applications of the District of Columbia v. District of Columbia Bd. of Appeals & Review*, 829 A.2d 208, 217 (D.C. 2003)). Therefore, the issue was squarely before the court in the previous appeal. We held that the language in the

---

(…continued)
is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case.'" *Calomiris v. Calomiris*, 3 A.3d 1186, 1190 (D.C. 2010) (citing *Elwell v. Elwell*, 947 A.2d 1136, 1140 (D.C. 2008)).

statute is clear and the Commission may not depart from the allocation formula set forth therein.

## B. The Amended ECIIFA Does Not Contravene the Home Rule Act

Petitioner argues in the alternative that if the amended ECIIFA does deprive the Commission of discretion to allocate the costs of undergrounding, the statute is "unconstitutional" because it violates the Home Rule Act. The Commission declined to address this issue, invoking "well established law that state agencies do not have the jurisdiction to review the constitutionality of statutes." AOBA did not present this argument to the Commission in connection with the previous application or to this court in the prior appeal.[4]

---

[4] As demonstrated above, the language which tied allocations of costs to the previous base rate case was in the original Act, and AOBA could have presented its "constitutionality" argument to the Commission in the prior proceeding. But even if AOBA had done so, that effort would have been futile. The Commission would have reached the same conclusion that it did not have jurisdiction to review the issue. *See District of Columbia Hous. Auth. v. District of Columbia Office of Human Rights*, 881 A.2d 600, 613 n.18 (D.C. 2005) (explaining that a party has not waived a claim when it "clearly would have been futile to raise the claim in the agency venue") (citing *Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 682 (D.C. Cir. 1983)). The 2015 amendment of ECIIFA went into effect after AOBA filed its initial brief in the prior appeal. AOBA argued that the amendment did not apply retroactively, but it did not claim that the original Act or the amended version was "unconstitutional."

## 1. The Home Rule Act

The United States Constitution confers upon Congress plenary power to legislate for the District of Columbia. U.S. Const. art. I, § 8, cl. 17 ("The Congress shall have Power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over the . . . Seat of the Government of the United States."). However, in 1973 Congress enacted the Home Rule Act, set forth in Title I, Chapter II of the D.C. Code, to "grant to the inhabitants of the District of Columbia powers of local self-government." D.C. Code § 1-201.02(a) (2012 Repl.); *see Woodroof v. Cunningham*, 147 A.3d 777, 782 (D.C. 2016) (discussing legislative history of the Home Rule Act). While reserving to itself "the right, at any time, to exercise its constitutional authority as legislature for the District," D.C. Code § 1-206.01 (2012 Repl.), Congress delegated broad legislative power to the Council of the District of Columbia. "[T]he legislative power of the District shall extend to all rightful subjects of legislation within the District . . . ." D.C. Code § 1-203.02 (2012 Repl.).

Notwithstanding this broad delegation of power, section 602 of the Home Rule Act prohibits the Council from legislating on certain subjects. *See, e.g.*, D.C. Code § 1-206.02(a)(1) (2012 Repl.) (the Council "shall have no authority" to

"[i]mpose any tax on property of the United States"); D.C. Code § 1-206.02(a)(5) (2012 Repl.) (the Council "shall have no authority" to enact a so-called commuter tax on the income of persons who do not reside in the District). We have held that these express limitations on the Council must be construed narrowly "so as not to thwart the paramount purpose of the [Home Rule Act], namely, to grant the inhabitants of the District of Columbia powers of local self-government." *Woodroof*, 147 A.3d at 784 (citing *Andrew v. Am. Imp. Ctr.*, 110 A.3d 626, 629 (D.C. 2015)). There is no provision stating that the Council "shall have no authority" to legislate on matters regulated by the Public Service Commission. [5]

## 2. The District Charter

But Congress limited the power of the Council in another important manner. Subchapter IV of the Home Rule Act, known as the District Charter, establishes the structure of governance for the District of Columbia. *See* D.C. Code §§ 1-

---

[5] Petitioner argues that the legislative history of the Home Rule Act supports the conclusion that the Council was prohibited from enacting the amended ECIIFA. When drafting the Home Rule Act, legislators discussed the independent decision-making authority of the Commission. However, the discussions of the committee members reported in the legislative history give no clear guidance as to what types of direction from the Council related to rates and surcharges would constitute impermissible interference with the independence of the Commission.

204.01–204.115 (2012 Repl.). The Council acting alone cannot amend the Charter. To make such an amendment, an act passed by the Council must be ratified by a majority of voters through a referendum. D.C. Code § 1-203.03(a) (2012 Repl.).

In many ways, the Charter acts as a constitution for the District of Columbia, and AOBA uses the word "unconstitutional" in arguing that the allocation directives in the ECIIFA statute are void. The core of Petitioner's argument is that the independence of the Public Service Commission is protected by the Charter and that the amended 2017 ECIIFA is invalid because it purports to change the authority of the Commission to allocate costs. Petitioner asserts that the Council has in effect amended the Charter without submitting that question to the voters in a referendum.

### 3. The Commission

Congress created the Public Utilities Commission in the District of Columbia Appropriations Act of 1913, which assigned various responsibilities and functions to the Commission. *See* 37 Stat. 974, ch. 150, § 8, par. 1, 97 (1913). This agency was renamed the Public Service Commission in 1964. Pub. L. No.

88-503, § 21, 78 Stat. 634 (1964).  While erecting the structure of Home Rule government for the District, the Charter preserved the Commission and briefly described its function.

> There shall be a Public Service Commission whose function shall be to insure that every public utility doing business within the District of Columbia is required to furnish service and facilities reasonably safe and adequate and in all respects just and reasonable.  The charge made by any such public utility for any facility or services furnished, or rendered, or to be furnished or rendered, shall be reasonable, just, and nondiscriminatory.  Every unjust or unreasonable or discriminating charge for such facility or service is prohibited and is hereby declared unlawful.

D.C. Code § 1-204.93 (2012 Repl.).  The second and third sentences of Section 493 were taken from the second paragraph of the Public Utilities Act of 1913.  *See* 37 Stat. 974, ch. 150, § 8, par. 2 (1913).

The enactment of Section 493 did more than simply continue the Commission in existence, however.  By placing this provision in the Charter, Congress insulated Section 493 from repeal or amendment by ordinary legislation of the Council.  In the Charter, Congress also designated the Commission as one of five Independent Agencies.  *See* 87 Stat. 774, §§ 491-95 (1973).  AOBA asserts

that the Council's "allocation of Undergrounding Charges conflicts with the Commission's independent and exclusive obligation to 'insure' that 'every' charge levied by Pepco is just, reasonable, and nondiscriminatory." In other words, AOBA says, "the Council has fundamentally altered the function of the Commission and this fundamental alteration, in turn, has violated the Charter."

Although the brief of the District of Columbia takes an expansive view of the Council's power in the field of utility regulation, it acknowledges that, by placing Section 493 in the Charter, Congress "preclude[d] the Council, by ordinary legislation . . . , from abolishing the Commission or altering its basic functions of ensuring that public utilities 'furnish service and facilities reasonably safe and adequate and in all respects just and reasonable.'" Pepco agrees that "the Council might run afoul of [§ 493] if it eliminated the PSC or vested the PSC's 'function' of regulating utilities in some *other* agency."

But ECIIFA did not change a single word of Section 493, so the question presented here is whether there has been a "constructive" amendment of this Charter provision. AOBA's arguments in favor of that conclusion depend in large part on a misguided view of what it means to be an "independent" agency. Congress and state legislatures routinely specify how independent agencies must

go about their work. Focusing on the local scene, the three sentences of Section 493 have never been deemed sufficient to govern the complex field of utility regulation. Even a brief review of the D.C. Code demonstrates that the Commission does not work in isolation, without direction or assistance from the legislature.

The Public Utilities Act of 1913 granted the Commission its ratemaking authority. 37 Stat. 974, ch. 150, § 8, par. 24, 38-45 (1913). These provisions survive to the present day (outside the Charter), *see* D.C. Code §§ 34-1123, 34-908, 34-910–34-916 (2012 Repl.), and are subject to amendment through the legislative power delegated to the Council under the Home Rule Act. *See* D.C. Code §§ 1-201.02, 1-203.02, 1-204.01–204.13 (2012 Repl.) (Congress provided a general grant of legislative authority allowing the Council to perform its core legislative function).

Title 43 of the D.C. Code, entitled "public utilities," existed before Home Rule. *See generally* D.C. Code §§ 43-201–43-422 (1973) (prescribing the number of Commissioners and how they were to be appointed; designing the organization of the Commission; and declaring the Commission's authority with respect to rates, examinations, investigations, and hearings). D.C. Code § 43-301 (1973) was

almost identical to the current Section 493, mandating that charges "shall be reasonable, just, and nondiscriminatory." A multitude of laws giving the Commission its authority and regulating its operations existed prior to Home Rule and remain in effect today.[6]

The question presented here is whether the Council went too far by enacting the 2015 and 2017 ECIIFA amendments. There is not much case law to guide us. Addressing different legislation affecting the Commission, the United States

---

[6] *See*, *e.g.*, §§ 43-201 (1973), 43-401 (1981), 34-801 (2012 Repl.) (specifying the organization of the Commission and establishing the process for appointing commissioners); §§ 43-206 (1973), 43-408 (1981), 34-806 (2012 Repl.) (permitting the Commission to hire employees and incur expenses); D.C. Code §§ 43-303 (1973), 43-503 (1981), 34-1103 (2012 Repl.) (granting the Commission authority to compel public utilities to comply with laws and regulations); §§ 43-306 (1973), 43-506 (1981), 34-1106 (2012 Repl.) (telling the Commission how to value property of every public utility); §§ 43-317 (1973), 43-517 (1981), 34-1117 (2012 Repl.) (permitting the Commission to allow a sliding scale of rates and dividends); §§ 43-319 (1973), 43-519 (1981), 34-1119 (2012 Repl.) (requiring the Commission to publish annual reports); §§ 43-401 (1973), 43-601 (1981), 34-901 (2012 Repl.) (outlining the process for parties to file applications to change existing rates); §§ 43-408 (1973), 43-608 (1981), 34-908 (2012 Repl.) (authorizing the Commission to investigate unreasonable or unjustly discriminatory rates on its own initiative or upon reasonable complaint); §§ 43-411 (1973), 43-611 (1981), 34-911 (2012 Repl.) (authorizing the Commission to determine and substitute just and reasonable rates upon such investigation); §§ 43-601 (1973), 43-1001 (1981), 34-301 (2012 Repl.) (conferring general powers upon the Commission); §§ 43-906 (1973), 43-306 (1981), 34-706 (2012 Repl.) (authorizing the imposition of penalties for failure to comply with Commission orders).

District Court for the District of Columbia considered what types of actions would constitute a charter amendment.

> Charter amendments . . . refer to actions which, like state constitutional amendments, fundamentally change the nature of the system of government. . . . Though the Act does involve some changes concerning the structure of the Public Service Commission, these changes do not in any significant way alter the structure or manner in which the Public Service Commission operates; its basic mission remains intact.

*Potomac Elec. Power Co. v. District of Columbia Gov't*, 651 F. Supp. 907, 910-11 (D.D.C. 1986) (discussing the Utility Regulatory Assessment and Clarification Act of 1984, which made clear that the Office of People's Counsel has "independent authority" (with oversight from the Commission) to investigate utilities, compel production of information, and make assessments for expenses). The court was concerned that adopting too rigid a view of what constitutes a charter amendment "would strip local legislators of any real flexibility to deal with emerging problems." *Id*. at 911. While this opinion is not binding on us, the District Court's analysis is helpful.

### 4.  The Impact of ECIIFA

With this background in mind, we turn to the legislation at issue here. In a "base rate case" the Commission identifies how much revenue Pepco requires and decides how to allocate that requirement between Pepco's customer classes, commercial and residential. *See* 129 A.3d at 928. This case is about a surcharge, not the base rate itself, but the process is similar, addressing both cost and allocation. We do not attach any significance to the term "surcharge" because Section 493 requires the "charge" made by a public utility to be "reasonable, just, and nondiscriminatory," seemingly encompassing both rates and surcharges.

Although the Undergrounding Project carries a hefty price tag, AOBA asserts that "[w]hether Pepco facilities will or will not be relocated underground is not at issue in this appeal." Moreover, we are told, "[t]his appeal . . . is not about the *amount* of the Undergrounding Charges, but about the *allocation* of [those charges]." But Petitioner admits that its long-range concern is more comprehensive. AOBA clarifies that its challenge to the 2017 ECIIFA is targeted at "the impact of the cost allocation provisions on the Commission's *ratemaking* authority." It fears that if we approve the legislation at issue here, "the elected Council, in the name of expediency, efficiency and cost-effectiveness, – or more disturbing[,] for purely political reasons – will now be able to enact legislation mandating not only cost allocations, but the establishment of specific rates to be

charged for utility services." Nothing we say today is intended to endorse that result.

Nevertheless, resolving this case does not require us to explore the outer limits of the Council's authority to regulate public utilities. We focus, instead, on the immediate, practical effect of the legislative directive. By statute, and for good reason, decisions in undergrounding cases are to be expedited. D.C. Code §§ 34-1313.09(b)(1), (d); 34-1313.17 (2018 Supp.). The modest effect of the ECIIFA amendments is to streamline procedure by precluding constant relitigation of allocation issues in both base rate cases (which may occur every year) and undergrounding proceedings (every two years). In the Commission's own view, the purpose of ECIIFA's requirements "is not to undermine the Commission's independent ratemaking authority, but to build in the administrative efficiencies needed to facilitate timely implementation of a project of this scale and importance."

It is important to recognize that the Council has not dictated an allocation of its own design, but rather has instructed the Commission to apply the allocation that *it* adopted in the most recent base rate proceeding. Furthermore, that allocation is transitory. The Commission is free to change the allocation of those

costs in subsequent base rate cases. As we noted in the previous appeal, the Commission's allocation of costs in future base rate cases "could well affect the allocation of costs in future orders issued in connection with the undergrounding project." 129 A.3d at 934 (citing D.C. Code § 34-1313.01(a)(4)).[7]

We reiterate that ECIIFA did not change a single word in Section 493. Nor, for the reasons explained, does it usurp the function of the Commission. We therefore hold that the cost allocation provisions of ECIIFA do not violate the Home Rule Act.

### C. AOBA's Due Process Rights Were Not Violated

AOBA asserts that its due process rights were violated when the Commission denied an evidentiary hearing. As a general matter, the Commission is required to hold a hearing if there is a dispute concerning a material fact, but not if the only dispute involves issues of law or policy. *Watergate East*, *Inc. v. District*

---

[7] In fact, the Commission approved a different base rate on August 9, 2018, a proceeding in which AOBA was a party. That case was resolved when the Commission approved a non-unanimous settlement agreement. *See Formal Case No. 1150*, Order No. 19433, 2018 WL 3830911 (Aug. 9, 2018). That agreement included a moratorium until May 1, 2019, during which Pepco cannot file for a rate increase. Presumably, AOBA will be able to raise allocation/subsidization issues and undergrounding costs in the next base rate case.

*of Columbia Public Serv. Comm'n*, 662 A.2d 881, 890 (D.C. 1995). More specifically, when it considers an undergrounding plan or a related application for financing, a "formal evidentiary hearing shall be required only if contested issues of material fact are present and those issues cannot be resolved by the Commission based on the pleadings and discovery responses filed, if any, in the matter." D.C. Code § 34-1313.03(b)(2) (2018 Supp.); *see also id*., § 1313.09(c)(2) (nearly identical language).

AOBA asserted before the Commission that there were three material issues: "(1) rate shock; (2) customer transfers in the true-up process; and (3) feeder selection methodology." On October 20, 2017, the Commission issued Order No. 19144 in which it denied the hearing request, holding that AOBA had not "identified any contested issues of material fact requiring an evidentiary hearing and that, in any event, all issues identified by AOBA can be resolved on the pleadings and discovery responses." The Commission addressed each of AOBA's assertions, explaining that they were not really disputes of fact but more in the nature of policy concerns. In addition, the Commission noted that these issues had already been litigated in *Formal Case Nos. 1139 and 1116.*[8]

---

[8] In *Formal Case No. 1139*, the base rate case prior to this appeal, the Commission considered issues related to commercial class subsidization of

(continued…)

AOBA also contends it was a due process violation to deny an evidentiary hearing to address a directive in which the General Services Administration ("GSA") initially told federal agencies not to pay the undergrounding charges. This turned out to be a false alarm. GSA pointed out in its amicus brief to this court that "federal agencies are paying those charges, subject to GSA's objection to the DDOT Surcharge and a reservation of rights to further contest the surcharge." Whatever the effect of that "objection" and "reservation" may be, it seems that federal agencies were paying the charges and that they continue to do so. There was no "shortfall" in collections that would have to be made up by commercial customers. Furthermore, the statute makes clear what should happen in such

---

(…continued)

residential class costs, concluded that the proposed rate adjustments were just and reasonable "for all Pepco customers in the District of Columbia," and discussed the fact that the costs of the undergrounding project had not yet had an impact on rates. *See* Order 18846, 2017 WL 3333815, at *3, *147 (July 25, 2017). In *Formal Case No. 1116*, the Commission applied the 2014 ECIIFA and concluded that the undergrounding project charges were just and reasonable. *See* Order No. 17697, 2014 WL 6603082, at *67, *83, *100-01 (Nov. 12, 2014). As mentioned above, the project did not go forward at that time and Pepco and DDOT submitted a new Joint Application to the Commission in July 2017.

circumstances. *See* D.C. Code § 34-1313.14(f)(1) (2018 Supp.). There was no need for an evidentiary hearing on this point.[9]

AOBA's argument that the Commission applied an incorrect standard in determining that there was no need for an evidentiary hearing is misguided. The Commission's decision was not a "summary dismissal," and the standards for granting summary judgment in a civil case did not apply. Indeed, the ECIIFA provides its own standard for determining whether the Commission should hold a hearing before deciding the issues on their merits. *See* D.C. Code §§ 34-1313.03(b)(2); 34-1313.09(c)(2) (2018 Supp.). When it did address the merits, the Commission gave reasoned consideration to each of the issues raised by AOBA and explained its decision in its Order. The record thus refutes AOBA's claim that it was denied due process.

## D. Additional Matters

[9] Proffering testimony from an expert witness, Bruce Oliver, petitioner attached a detailed summary of his testimony (in question and answer form) to its request for a hearing. In both the Order denying AOBA's request for a hearing (No. 19144) and its Order approving the joint application (No. 19167), the Commission cited to and summarized this testimony, demonstrating that any material issues raised by AOBA could be resolved on the pleadings and discovery responses alone. No other witnesses were proffered by petitioner, but Pepco and DDOT proffered the testimony of several witnesses in the same manner and their testimony was referred to in Order No. 19167.

Two additional issues deserve only brief mention. GSA, as *amicus*, argues that the Commission's decision to incorporate records from the previous undergrounding proceedings violated due process rights. However, GSA is not a party to this appeal and AOBA did not raise this claim in its statement of issues presented or the argument section of its initial brief to this court. "[A]n amicus curiae must take the case as he finds it, with the issues made by the principal parties." *Givens v. Goldstein*, 52 A.2d 725, 726 (D.C. 1947). In any event, neither GSA nor AOBA has identified a single document that was incorporated into the record of *Formal Case No. 1145* and relied upon by the Commission in violation of their due process rights.

AOBA complains that the Commission's public interest finding is not supported by substantial evidence, but it did not present this complaint to the Commission in its Applications for Reconsideration. *See* D.C. Code § 34-604 (2012 Repl.) ("No public utility or other person or corporation shall in any court urge or rely on any ground not so set forth in said application."). This issue is not properly before us.

## IV.   Conclusion

We adhere to our previous decision that the Commission may not depart from the allocation formula prescribed in the statute.  We further hold that the 2015 and 2017 amendments to the Electric Company Infrastructure Improvement Financing Act of 2014 do not violate the Home Rule Act.  In addition, AOBA's due process rights were not violated.  The orders of the Public Service Commission are

*Affirmed.*