*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-AA-332

SIDNICE HUGHES-TURNER, PETITIONER,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

SUPERCUTS, et al., INTERVENORS.

On Petition for Review of a Decision and Order of the
District of Columbia Department of Employment Services
Compensation Review Board
(CRB-20-025)

(Argued September 30, 2021          Decided July 14, 2022)

*Matthew J. Peffer* for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time, *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time, and *Carl J. Schifferle*, Deputy Solicitor General, filed a statement in lieu of a brief for respondent.

*Robin E. Hauptmann* for intervenors.

Before GLICKMAN, MCLEESE, and DEAHL, *Associate Judges*.

Opinion of the court by *Associate Judge* MCLEESE.

Opinion by *Associate Judge* DEAHL, dissenting, at page 19.

MCLEESE, *Associate Judge*: Petitioner Sidnice Hughes-Turner challenges a decision of the Compensation Review Board (CRB) limiting her eligibility for disability payments. We vacate and remand.

## I.

Except as indicated, the following facts appear to be undisputed for purposes of this petition for review. Ms. Hughes-Turner worked as a hairstylist for intervenor Supercuts. She suffered a work-related injury that limited her ability to work. In the following years, she received several different types of disability benefits, including temporary partial benefits, temporary total benefits, and "non-schedule" permanent-partial benefits. (We briefly explain those various kinds of disability benefits later in this opinion.)

A question eventually arose about whether D.C. Code § 32-1505(b) (2019 Repl.) limited Ms. Hughes-Turner's ability to receive further disability benefits. Section 32-1505(b) provides that, "[f]or any one injury causing temporary or

permanent partial disability, the payment for disability benefits shall not continue for more than a total of 500 weeks." After extensive proceedings, the CRB concluded that § 32-1505(b) precluded Ms. Hughes-Turner from receiving more than an aggregate total of 500 weeks of temporary total benefits and "non-schedule" permanent-partial benefits. *Hughes-Turner*, CRB No. 20-025, 2020 WL 7226238, at *1-2 (Comp. Rev. Bd. Mar. 31, 2020) (*Hughes-Turner IV*).

## II.

The District of Columbia Workers' Compensation Act (WCA), D.C. Code § 32-1501 et seq. (2019 Repl.), classifies disabilities as either temporary or permanent and also as either partial or total. D.C. Code § 32-1508. A disability becomes permanent rather than temporary once the claimant's condition reaches "maximum medical improvement." *Capitol Hill Hosp. v. District of Columbia Dep't of Emp. Servs.*, 726 A.2d 682, 686 (D.C. 1999) (internal quotation marks omitted). "A claimant suffers from total disability if [the claimant's] injuries prevent [the claimant] from engaging in the only type of gainful employment for which [the claimant] is qualified." *Clark Constr. Grp., LLC v. District of Columbia Dep't of*

*Emp. Servs.*, 163 A.3d 768, 776 (D.C. 2017) (emphasis and internal quotation marks omitted).

Temporary partial benefits are capped at five years.  D.C. Code § 32-1508(5).  Temporary total benefits are capped at 500 weeks.  D.C. Code §§ 32-1508(2), -1505(b); *Clement v. District of Columbia Dep't of Emp. Servs.*, 126 A.3d 1137, 1139-41 (D.C. 2015).

> [The WCA] divides permanent partial disabilities into two categories, "schedule" and "non-schedule."  Schedule disabilities are those involving the loss or impairment of certain specified body parts, e.g., the loss of an arm, leg, or eye.  For each such injury, a worker is entitled to receive [compensation] for a fixed number of weeks that varies depending on the particular body part injured and the degree of its impairment, regardless of the actual wage loss the worker sustains as a result of the injury.  In contrast, for other partially disabling injuries (i.e., to parts of the body not listed in the "schedule," such as the back or neck), the worker's disability compensation is measured by his or her actual or imputed wage loss attributable to the injuries.

*Brown v. District of Columbia Dep't of Emp. Servs.*, 83 A.3d 739, 743 n.6 (D.C. 2014) (citations omitted).  "Non-schedule" permanent partial benefits are capped at 500 weeks.  D.C. Code §§ 32-1508(3)(V), -1505(b).

Finally, there is no durational cap on permanent total benefits. D.C. Code § 32-1508(1).

One provision of the WCA specifically addresses whether claimants can receive more than one type of disability benefits in connection with a single incident. *See* D.C. Code § 32-1508(3) (permanent partial benefits are "in addition to compensation for temporary total disability or temporary partial disability"). We also have decided cases addressing various other permutations of that general question. *See, e.g.*, *Brown*, 83 A.3d at 752-756 (addressing issues arising from award of both "non-schedule" and "schedule" permanent partial benefits). It is undisputed in this case that Ms. Hughes-Turner can permissibly obtain temporary partial benefits, temporary total benefits, and "non-schedule" permanent partial benefits. It also is undisputed that Ms. Hughes-Turner can receive no more than five years of temporary partial benefits, no more than 500 weeks of temporary total benefits, and no more than 500 weeks of "non-schedule" permanent partial benefits. Rather, the dispute is about the extent to which D.C. Code § 32-1505(b) imposes an aggregate cap on Ms. Hughes-Turner's recovery of such benefits.

As previously noted, § 32-1505(b) provides that, "[f]or any one injury causing temporary or permanent partial disability, the payment for disability benefits shall

not continue for more than a total of 500 weeks." This court has already squarely addressed one ambiguity in § 32-1505(b): whether the 500-week cap applies to temporary total benefits. *Clement*, 126 A.3d at 1139-41. Considered in isolation, § 32-1505(b) is ambiguous on that point, because it is not clear whether the word "temporary" modifies only "disability" or instead modifies "partial disability." *Id.* at 1140. On the former reading, the 500-week cap would appear to apply both to temporary partial benefits and to temporary total benefits, whereas on the latter reading the 500-week cap would apply to temporary partial benefits, but not to temporary total benefits.

Our holding in *Clement* that § 32-1505(b) is ambiguous on the point then at issue did not rest solely on the text of § 32-1505(b) in isolation. To the contrary, we explained that "even where statutory language has a superficial clarity, a detailed consideration of other factors, such as the specific context in which that language is used and the broader context of the statute as a whole, when viewed in light of the statute's legislative history, may reveal ambiguities . . . ." 126 A.3d at 1139-40. We then addressed other such considerations, including the legislative history of the WCA and the fact that the WCA provides a separate five-year cap on temporary partial benefits. *Id.* at 1140-41. In light of those considerations, we held that § 32-

1505(b) is ambiguous and that the CRB had reasonably concluded that the 500-week cap in § 32-1505(b) does apply to temporary total benefits. *Id.*

This case presents a different question about the meaning of § 32-1505(b): Does the 500-week cap apply individually to each different type of benefits to which the cap applies, so that a claimant could receive up to 500 weeks of temporary total benefits and up to an additional 500 weeks of "non-schedule" permanent partial benefits; or does the 500-week cap instead apply in the aggregate, so that a claimant could get no more than 500 weeks of all benefits subject to the cap?

As noted, the CRB concluded that the 500-week cap applies in the aggregate. *Hughes-Turner IV*, 2020 WL 7226238, at *1-2. The CRB explained its conclusion in several rulings. In *Hughes-Turner*, CRB No. 18-005, 2018 WL 1696862 (Comp. Rev. Bd. Mar. 12, 2018) (*Hughes-Turner I*), the CRB appeared to view § 32-1505(b) as ambiguous on the point at issue. *Id.* at *4-6. The CRB resolved that ambiguity by relying on the view that permitting more than 500 weeks of benefits in the aggregate would be contrary to the legislative history of the provision. *Id.* at *5-6. In *Hughes-Turner*, CRB No. 19-120, 2020 WL 743005 (Comp. Rev. Bd. Jan. 24, 2020) (*Hughes-Turner III*), however, the CRB's reasoning was somewhat different. In that decision, the CRB concluded that the language of § 32-1505(b)

unambiguously provides that the 500-week cap applies in the aggregate. *Id.* at \*3. The CRB went on to explain that it would have reached the same conclusion even if § 32-1505(b) were ambiguous. *Id.* at \*4-5. In support of that conclusion, the CRB relied on two related points. *Id.* First, the CRB indicated that applying the 500-week cap in the aggregate would be more consistent with the legislative history of the amendments that included § 32-1505(b), which were intended to impose limits on workers' compensation costs. *Id.* at \*5. Second, the CRB indicated that applying the 500-week cap in the aggregate would bring the WCA "more in line" with the benefits caps in Maryland and Virginia. *Id.* (internal quotation marks omitted).

## III.

We may reverse a CRB decision "only if we conclude that the decision was arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with the law." *Placido v. District of Columbia Dep't of Emp. Servs.*, 92 A.3d 323, 326 (D.C. 2014) (internal quotation marks omitted). "[T]his court generally defers to reasonable agency interpretations of ambiguous statutes under which the agency acts." *Butler v. Metro. Police Dep't*, 240 A.3d 829, 836 (D.C. 2020). We do not defer to the agency, however, on whether statutory language is or is not ambiguous. *See, e.g.*, *Medstar Health, Inc. v. District of Columbia Dep't of Health*, 146 A.3d

360, 370 n.30 (D.C. 2016) ("Once we have determined that an administrative statute is ambiguous, we may defer to an agency's interpretation of that ambiguity."). Finally, "[t]he court ordinarily will not affirm an agency action that is inadequately explained." *Miranda v. District of Columbia Dep't of Emp. Servs.*, 257 A.3d 467, 471 (D.C. 2021).

We conclude that § 32-1505(b) is ambiguous. We turn first to the language of the provision. *See, e.g., Hosp. Temps Corp. v. District of Columbia*, 926 A.2d 131, 136 (D.C. 2007) ("The first step in construing a statute is to read the language of the statute and construe its words according to their ordinary sense and plain meaning.") (internal quotation marks omitted). As noted, § 32-1505(b) provides that, "[f]or any one injury causing temporary or permanent partial disability, the payment for disability benefits shall not continue for more than a total of 500 weeks." It is not clear how that language should apply to the issue before us.

One possible interpretation is that if the triggering condition is met -- i.e., the claimant has suffered an injury that caused "temporary or permanent partial disability" -- then the 500-week cap applies in the aggregate to all types of disability benefits. In other words, one could interpret "payment for disability benefits" to mean "total payment for all disability benefits added together." It appears to be

undisputed, however, that this interpretation would not be correct. That apparent agreement is not surprising. On this interpretation, § 32-1505(b) would have a remarkable consequence for claimants who initially suffer from a less serious disability that eventually develops into permanent total disability. As noted, permanent total benefits are not subject to a time limit. D.C Code § 32-1508(1) (benefits for permanent total disability are payable "during the continuance thereof"). If § 32-1505(b) imposed a 500-week aggregate cap on all disability benefits once the cap was triggered, then permanent total benefits would often become time-limited. No one has suggested that § 32-1505(b) implicitly repealed D.C. Code § 32-1508(1) in that way.

It follows that the phrase "payment for disability benefits" in § 32-1505(b) must be understood to have some implicit limit. One possible approach would be to interpret "payment for disability benefits" to mean "total payment for all types of disability benefits subject to the 500-week cap, added together." In essence, that seems to be the interpretation that the CRB adopted in this case. *Hughes-Turner III*, 2020 WL 743005, at *3. On this interpretation, temporary partial benefits might not count against the 500-week cap, because they are subject to a separate five-year cap. D.C. Code § 32-1508(5). In fact, the CRB concluded in this case that the 500-week cap was entirely inapplicable to temporary partial benefits. *Hughes-Turner I*, 2018

WL 1696862, at \*4 & n.1. (Neither party in this case disputes the exclusion of temporary partial benefits from the cap, and we therefore do not need to decide that issue.) Similarly, on this interpretation of "payment for disability benefits," "schedule" permanent-partial benefits might not count against the 500-week cap, because such benefits have their own specified time limits. D.C. Code § 32-1508(3); *see Brown*, 83 A.3d at 753 (noting that most courts hold that claimants can receive both "schedule" and "non-schedule" permanent-partial benefits, with benefits being paid consecutively and applicable time limits being "laid end-to-end") (internal quotation marks omitted).

Another possible approach, however, would be to interpret "payment for disability benefits" to mean "total payment for each specific type of disability benefits, each subject to its own 500-week cap." On that interpretation, a claimant could receive a total of 500 weeks of temporary total benefits and a separate total of 500 weeks of permanent partial benefits.

Considering the text of D.C. Code § 32-1505(b) in isolation, we do not view the text as unambiguously foreclosing the latter interpretation. Rather, we view it as somewhat unclear precisely what implicit limitation should be read into § 32-1505(b)'s 500-week cap. In any event, in deciding whether § 32-1505(b) is

ambiguous on the point at issue, we do not restrict our analysis to the text of the provision considered in isolation. *Clement*, 126 A.3d at 1139-40.

We have already noted some potential uncertainties that in our view contribute to the ambiguity of § 32-1505(b), such as the uncertainty as to which types of disability benefits are even subject to the 500-week cap. We briefly mention several additional considerations that also support the conclusion that § 32-1505(b) is ambiguous on the point at issue. First, there seems to be an anomaly under the CRB's approach. Imagine the following: (1) a claimant suffers a work-related injury; (2) the claimant initially is able to work to a degree, and therefore obtains temporary partial benefits for three years; and (3) the claimant's condition becomes permanent, so that the claimant obtains "non-schedule" permanent-partial benefits. Under the CRB's approach, the claimant can obtain 500 weeks of "non-schedule" permanent-partial benefits, because temporary partial benefits do not count against the 500-week cap. Compare a claimant whose situation is the same except that the claimant was initially so badly injured that the claimant could not work at all, and who therefore received three years (156 weeks) of temporary total benefits before improving and obtaining an award of "non-schedule" permanent-partial benefits. Under the CRB's approach, that claimant would be eligible to receive only 344 weeks of "non-schedule" permanent-partial benefits, because the temporary total

benefits would count against the 500-week cap. It seems counterintuitive that the claimant with the more severe disability would be entitled to a smaller amount of compensation than the claimant with the less severe disability.

Second, we note an ambiguity in the legislative history of the enactment of which § 32-1505(b) was a part. *See Clement*, 126 A.3d at 1140-41 (considering legislative history in determining whether provision was ambiguous). As this court has previously explained, that legislative history indicates that the enactment as a whole was intended to bring the workers' compensation law of the District "closer in line" with that of Maryland and Virginia. *Id.* at 1141 (internal quotation marks omitted). That general legislative history provides ambiguous guidance concerning the interpretation of the 500-week cap, however. It is undisputed that at the time of the enactment, Maryland and Virginia took differing approaches to aggregation of benefits. *Compare* Va. Code Ann. § 65.2-518 (West) (setting 500-week cap for "total compensation payable under this title") *with Sealy Furniture of Md. v. Miller*, 740 A.2d 594, 598 (Md. 1999) ("[T]emporary total disability, temporary partial disability, permanent total disability, and permanent partial disability are different compensable events, each justifying a separate award . . . ."), *superseded by* Md. Code Ann. Lab. & Empl. § 9-610.1(2) (West 2022) (claimant's permanent partial benefits can be reduced by amount of previously paid temporary total benefits).

Third, we note an important aspect of "the broader context of the statute as a whole." *Clement*, 126 A.3d at 1140 (considering broader context in determining whether statutory language was ambiguous). "This court follows the principle that workers' compensation statutes should be liberally construed to achieve their humanitarian purpose." *McCamey v. District of Columbia Dep't of Emp't Servs.*, 947 A.2d 1191, 1197 (D.C. 2008) (internal quotation marks omitted). That principle provides additional support for the reading of § 32-1505(b) advocated by Ms. Hughes-Turner.

For the foregoing reasons, we conclude that § 32-1505(b) is ambiguous as to whether the 500-week cap applies in the aggregate to temporary total benefits and permanent partial benefits, or whether instead the 500-week cap applies separately to each type of benefit.

The CRB concluded that it would adopt the same interpretation of § 32-1505(b) even if that provision were ambiguous. *Hughes-Turner III*, 2020 WL 743005, at *4-5. We are unable to uphold that conclusion, for two reasons. First, the CRB's interpretation of § 32-1505(b) rested heavily on the view that the "stated

purpose of the legislation" was to create an aggregate cap "more in line with the 500-week Maryland and Virginia caps." *Id.* at *5 (internal quotation marks omitted). As we have explained, however, Maryland and Virginia took quite different approaches to the issue of aggregation at the time § 32-1505(b) was enacted. This important aspect of the CRB's analysis is therefore erroneous. That error alone would ordinarily require us to remand to the CRB. *See, e.g.*, *Apartment & Off. Bldg. Ass'n of Metro. Wash. v. Pub. Serv. Comm'n*, 129 A.3d 925, 930 (D.C. 2016) ("Generally, an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.") (internal quotation marks omitted).

Second, the rest of CRB's analysis was quite brief. *Hughes-Turner III*, 2020 WL 743005, at *5-6. The CRB's only other point was that applying the 500-week cap in the aggregate would be more consistent with the legislative history of the amendments that included § 32-1505(b), which were intended to limit workers' compensation costs. *Id.* We agree that this point can reasonably be viewed as tending to support the interpretation adopted by the CRB. The CRB did not address, however, the other considerations discussed above, including the principle that the WCA should be interpreted liberally in light of its humanitarian purposes. *See, e.g.*, *Douglas-Slade v. United States Dep't of Transp.*, 959 A.2d 698, 702 (D.C. 2008)

("An appellate court cannot stand in the place of an administrative agency and attempt to determine how the administrative agency would have decided a matter if part of its decisional base is in error for failure to address all relevant contentions."); *Nelson v. District of Columbia Dep't of Emp. Servs.*, 530 A.2d 1193, 1197 (D.C. 1987) (directing CRB on remand to consider humanitarian purpose of WCA). A remand is therefore necessary for the CRB to more fully consider the proper interpretation of § 32-1505(b) and more fully explain its conclusions.

The dissent concludes that § 32-1505(b) unambiguously provides for a 500-week cap applicable in the aggregate to temporary total benefits and permanent partial benefits. *Infra* at 19-25. We respectfully disagree, and we note three specific points. First, the dissent states that the CRB's decision in *Hughes-Turner I*, 2018 WL 1696862, did not suggest that § 32-1505(b) is ambiguous as to whether the 500-week cap "applies to different types of disability benefits in the aggregate." *Infra* at 19-20 n.1. To the contrary, the CRB in *Hughes-Turner I* generally referred to § 32-1505(b) as ambiguous, explained that "any interpretation should be resolved in light of the legislative intent and principles of the [WCA]," and based its interpretation of § 32-1505(b) not on plain language but rather on the ground that a contrary interpretation would be inconsistent with the legislative history and purpose of § 32-1505(b). 2018 WL 1696862, at *4-6.

Second, the dissent states that "the word 'total' leaves it beyond doubt that multiple types of disability benefits will be treated cumulatively in assessing when the 500-week cap is reached." *Infra* at 19. We agree that "total" means that something should be aggregated, but the question is what. Another possibility is that "total" means that all periods of any given type of disability benefits are aggregated, even if those periods are not consecutive. In other words, all periods of temporary total disability, taken together, may not exceed 500 weeks.

Third, the dissent acknowledges that § 32-1505(b) is ambiguous as to the types of disability benefits that are subject to the 500-week cap. *Infra* at 20. In the dissent's view, that ambiguity is "immaterial." *Id.* In our view, however, that ambiguity is quite material. Section 32-1505(b)'s language, read in isolation, could perhaps most naturally be interpreted as establishing an overall cap of 500 weeks on all disability benefits arising from a single injury. The dissent acknowledges, however, that § 32-1505(b) should not be read in that way. *Infra* at 21. Rather, the various tools of statutory interpretation must be used to determine which disability benefits are subject to the 500-week cap. We conclude that the same is true when determining how to aggregate the benefits to which the 500-week cap applies.

To be clear, we express no ultimate view as to the proper interpretation of § 32-1505(b).  Rather, we simply remand to the CRB for further consideration of that issue.

For the foregoing reasons, we vacate the order of the CRB and remand for further proceedings.

*So ordered.*

DEAHL, *Associate Judge*, dissenting: Section 32-1505(b) places an aggregate cap on disability benefits per injury, not per type of disability benefit awarded. I agree with the CRB that this provision is not reasonably susceptible to any other reading, and thus respectfully dissent from the majority's vacatur and remand.

Section 32-1505(b) says that "[f]or *any one injury* causing temporary or permanent partial disability, the payment for disability benefits shall not continue for more than a *total* of 500 weeks." I do not see how one could read that language as conveying anything but an aggregate cap on disability benefits, per injury. The words "any one injury" establish that the unit of analysis is the underlying injury, not the various awards that might stem from it. And the word "total" leaves it beyond doubt that multiple types of disability benefits will be treated cumulatively in assessing when the 500-week cap is reached. The alternative, advanced by Hughes-Turner and indulged as plausible by the majority, is to treat § 32-1505(b)'s 500-week cap as applying separately to each particular type of disability benefit claimed. That would require us to read "any one injury" contrary to its plain meaning, and in the exact manner that the drafters seemed intent to avoid.[1]

---

[1] The majority agrees that the word total means "something should be aggregated, but the question is what," positing that maybe it means "all periods of any given type of disability benefits are aggregated." *Ante* at 17. The statutory text

The only textual ambiguity in this provision concerns what classes of disability are subject to the 500-week aggregate cap. But that ambiguity is immaterial to the question before us. I have no quibble with the majority that in the phrase, "causing temporary or permanent partial disability benefits," it is not clear whether "temporary" modifies "disability" or "partial disability." *Ante* at 5-6. That raises a question of whether temporary total disability benefits are subject to the 500-week aggregate cap. But we have already answered that question in the affirmative. *See Clement v. District of Columbia Dept. of Emp't Servs.*, 126 A.3d 1137, 1140 (D.C. 2015). Whatever other disability benefits are subject to § 32-1505(b)'s cap, there is thus no question that it applies to the two types of disability benefits at issue here: temporary total and permanent partial disability benefits. For those benefits, the statute clearly "imposes a 500-week cap upon the classes of benefits mentioned, *in combination*." *Hughes-Turner I*, 2018 WL 1696862 at *5 (emphasis added).[2]

---

answers the majority's question and forecloses the posited reading: what is aggregated is "payment for disability benefits," not payment for each particular type of disability benefit.

[2] I disagree with the majority's description of the CRB as having "appeared to view § 32-1505(b) as ambiguous" on this point in *Hughes-Turner I. Ante* at 7. The CRB did not suggest the statute is ambiguous as to whether the cap applies to different types of disability benefits in the aggregate. Instead, as the CRB later recapitulated, the only ambiguity in § 32-1505(b) "relates to what classes of benefits will fall under the cap," while "[t]here is no ambiguity" that the cap is an aggregate one applicable to whatever classes of benefits it applies to. *Hughes-Turner III*, 2020

As to the (here, immaterial) question of what other types of disability benefits are subject to the cap, I agree with the majority that permanent total disability benefits are not. The text of § 32-1505(b) excludes them by omission, by specifying "permanent *partial*" benefits. Plus, § 32-1508(1) seems to instruct that there is no durational limit on permanent total benefits. *See ante* at 9-10. With temporary total and permanent partial benefits subject to the cap, and permanent total benefits exempt from it, the only open question regards temporary partial benefits. The best reading of the statutory text is that temporary partial benefits are subject to the cap as well; regardless of whether "temporary" modifies "disability" or "partial disability," temporary partial disability fits within either reading. Though we have previously suggested—and perhaps held, quizzically in my view—that temporary partial benefits are not subject to § 32-1505(b)'s cap. *Clement*, 126 A.3d at 1141.

In *Clement*, we reviewed a CRB determination that § 32-1505(b)'s 500-week cap applies to temporary total benefits. 126 A.3d at 1138. We affirmed the CRB's interpretation that it does, and rejected an argument by petitioners that it should be read to apply *only* to temporary partial and permanent partial benefits. *Id.* In

---

WL 743005 at *3. It is at the very least uncharitable for the majority to attribute an inconsistency to the CRB's decisions where none is evident, particularly where the CRB member who authored *Hughes-Turner III* was a member of the *Hughes-Turner I* panel, and vice versa.

rejecting that argument, we opined that the 500-week cap does not apply to temporary partial benefits at all, because temporary partial benefits are already subject to a separate 5-year limit under § 32-1508(5), and imposing an additional 500-week cap on them would be "superfluous." *Id.* at 1140. That reasoning does not withstand scrutiny—there is nothing redundant about placing a cap on the amount of time a claimant can receive a given benefit, and simultaneously placing a larger cap on the amount of time that claimant can receive various benefits in combination. I doubt it is a holding, but that is admittedly a thorny question. *Alfaro v. United States*, 859 A.2d 149, 154 n.8 (D.C. 2004) ("Language in an opinion" that is "entirely unnecessary for the decision of the case . . . has no effect as indicating the law of the District."); *Diamond v. Hogan Lovells US LLP*, 224 A.3d 1007, 1019-20 (D.C. 2020) ("[F]or purposes of binding precedent, a holding is a narrow concept, a statement of the outcome accompanied by one or more legal steps or conclusions . . . 'necessary' to explain the outcome; other observations are dicta." (citation omitted)). But whether or not *Clement* holds that temporary partial benefits are excluded from § 32-1505(b)'s cap, that does not alter the conclusion that § 32-1505(b)'s cap applies to disability benefits in the aggregate.

The majority, however, treats the above ambiguity as if it casts doubt on whether § 32-1505(b) is an aggregate cap at all. It notes that if temporary partial

benefits are excluded from the cap—as we posited in *Clement*[3]—it would be anomalous to treat § 32-1505(b) as an aggregate cap in at least one scenario. *Ante* at 12. Namely, a claimant who suffers a temporary partial disability, and then sees their condition become permanent such that they would qualify for permanent partial benefits, would be in a position to receive more benefits than the claimant who initially suffers a temporary total disability. In other words, the less severely injured individual could collect more benefits than the more severely injured counterpart, because temporary partial benefits would not count against the 500-week cap, while temporary total benefits would. I agree that would be a "counterintuitive" result, *ante* at 12, and perhaps even an absurd one. But that is a reason to reject our statement in *Clement* that temporary partial benefits do not fit under the cap, rather than to extend its illogic further.

---

[3] The CRB in this case treated *Clement* as binding precedent for the proposition that temporary partial benefits do not fall under § 32-1505(b)'s cap, *Hughes-Turner I*, 2018 WL 1696862, at *4 & n.1, and nobody disputes the point here. Notably, *Clement* purported to defer to the CRB on this point, noting that even if it was "defensible" to include temporary partial benefits under § 32-1505(b)'s cap, the CRB's contrary interpretation was not "plainly erroneous." 126 A.3d at 1140. It would thus seem that the CRB is free to reconsider whether temporary partial benefits are subject to § 32-1505(b)'s cap, notwithstanding what we said in *Clement*, and it may thereby avoid the absurdity the majority posits.

Even assuming *Clement*'s discussion of temporary partial benefits is binding precedent, that is no reason to reject the plain reading of § 32-1505(b) as imposing an aggregate cap. Generally, we avoid statutory readings that lead to "absurd consequences which the legislature could not have intended." *See, e.g.*, *James Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C. 1989). But this absurdity doctrine is at its core a proxy for legislative intent; if one interpretation of a statute would lead to an absurd result, we presume that the legislature would not have intended it. *Id.* The doctrine has no force here, because the posited absurdity is entirely of our own devise. If we held in *Clement* that temporary partial benefits do not fall under the 500-week cap, the resulting absurdity stems from our own misstep. I would not double down on it and override the unambiguous meaning of a statute just to evade an absurdity we ourselves sowed into the statute.[4]

---

[4] As for the majority's reliance on the presumption in favor of a liberal reading of the disability statute, *ante* at 14, that consideration only comes into play when a statute's meaning is not clear. *See Hiligh v. District of Columbia Dep't of Emp't Servs.*, 935 A.2d 1070, 1075 (D.C. 2007) ("While this court appreciates that the Act is [to] be interpreted in a manner consistent with its humanitarian purpose, that mandate is not so broad as to allow" the CRB to award excess benefits when "there is no provision . . . from which the [CRB's] interpretation can reasonably arise."); *Butler v. Metro. Police Dep't*, 240 A.3d 829, 836 (D.C. 2020) (limiting deference to "reasonable agency interpretations of ambiguous statutes"). The statute here is clear on the point at issue, so there is no need to resort to that rule-of-thumb.

In short, because § 32-1505(b) is unambiguous as to the only question in this case, I would affirm. By remanding back to the CRB, requiring it to consider Hughes-Turner's case for a *fifth* time, the majority prolongs an already protracted dispute, and does so to seek clarity on questions that I believe are not implicated by this case.